Gail FOLKES, Plaintiff,

v.

NEW YORK COLLEGE OF OSTEO-PATHIC MEDICINE OF NEW YORK INSTITUTE OF TECHNOLOGY and Robert E. Mancini, Ph.D., D.O., Defendants.

No. CV 00–1492(WDW).

United States District Court, E.D. New York.

March 27, 2002.

Leopold Kaplan, New York City, for Plaintiff.

Catherine M. Murphy, Cullen & Dykman, Louise H. Feffer, Hirsch, Britt and Mose, Garden City, NY, for Defendants.

## MEMORANDUM AND ORDER

WALL, United States Magistrate Judge.

Before the court are motions for summary judgment by both defendants, New York College of Osteopathic Medicine of New York Institute of Technology (N.Y.COM) and Robert E. Mancini, and motions by both defendants for sanctions pursuant to Fed.R.Civ.P. 11. A "Notice, Consent, and Order of Reference for the Exercise of Jurisdiction by a United States Magistrate Judge" was signed by the parties and approved by District Judge Leonard Wexler on September 21, 2001, and this matter will thus be decided by the undersigned. For the reasons set forth herein, Mancini's motion for summary judgment is granted, NYCOM's motion for summary judgment is granted in part and denied in part, and the motions for Rule 11 sanctions are denied.

## BACKGROUND

In July 1999, the plaintiff, Gail Folkes, served the defendants with a Summons With Notice in Nassau County Supreme Court, alleging violations of New York Executive Law and Education Law, and asserting sexual harassment and the creation of a hostile educational environment. Murphy Aff. in Supp., Ex. A. A Verified Complaint in the action was served on the defendants six months later, on January 11, 2000. *Id.*, Ex. B. A Verified Answer was served and filed by NYCOM on Feb-

ruary 1, 2000 (*id.*, Ex. C) and by Mancini on February 14, 2000. The original complaint did not contain any allegations of federal law violations. An Amended Verified Complaint was served February 23, 2000 (Murphy Aff., Ex. D), and all of the defendants served amended answers on March 9, 2000 (*id.*, Ex. E; Britt Decl., Ex. U). The amended complaint repeated the allegations of sexual harassment and creation of a hostile educational environment, and contained general allegations that the defendants violated "rules, regulations, statutes and ordinances of ... the United States," and that NYCOM received federal funding. No federal claims were specified, but, because the amended complaint implied some federal cause of action, the defendants removed the action to this court.[1] Murphy Aff., Ex. F. The plaintiff did not move to remand.

During the course of the litigation, the plaintiff, an African American woman, apparently articulated specific federal claims, and, in her Proposed Pre–Trial Order, she claims to be seeking relief under Title IX, 20 U.S.C. §§ 1681–1688, which prohibits gender discrimination in educational programs receiving federal financial assistance, and Title VI, 42 U.S.C. § 2000d, which prohibits racial discrimination in all programs receiving federal financial assistance, not just educational programs. See Joint Proposed Pretrial Order at 3–5. Ms. Folkes is also pursuing several state law causes of action against both defendants.

In her amended complaint, the plaintiff alleges numerous incidents of sexual harassment by defendant Mancini, the first in May 1993 and the last in May 1997. During the relevant time period, Folkes was a student at NYCOM and Mancini was a Professor and the Assistant Dean of Clinical Sciences. Most of the alleged incidents are claimed to have occurred in 1993 and 1994, with three additional incidents allegedly occurring in August 1995, August 1996 and May 1997. As discussed in more detail *infra*, Folkes claims that she reported some of the earlier incidents to two officials of the school, Dr. Jerome Blue, then Dean of Minority Affairs, and Dr. Eileen Di Giovanna, then Assistant Dean for Student Affairs. The defendants claim that she did not, and both Dr. Blue and Dr. DiGiovanna denied at their depositions that Folkes ever reported incidents of sexual or racial harassment or abuse, but talked to them only about her academic difficulties. Di Giovanna Aff. at ¶ 11 and Schiowitz Aff., Ex. L, Blue Dep. Tr. at 21–24, 32–34, 36, 37, 39 & 48. It is undisputed that Folkes told no one in authority at the school about any incidents occurring after summer 1994.

It is also undisputed that Folkes was a student at NYCOM from 1992 until December 1997. At the end of her second year, Folkes failed two classes and received a "P*," indicating a pass after a make-up exam, in eight other courses. As a result, she was placed in the school's deceleration program, which allowed students who were having academic difficulties to complete the program in five, rather than four, years. See DiGiovanna Aff. at ¶ 4 & Ex. A; Schiowitz Aff. at ¶ 6 & Ex. C. The plaintiff was ultimately terminated from NYCOM as of December 1997 because of her repeated failures on Part I of the National Board of Medical Examiners

---

1. Under these circumstances, the court has reservations about the validity of the original removal. Although an alleged federal claim need not be labeled as such to fall within the federal jurisdiction, courts are resistant to finding a federal claim by implication. *See*

*F.W. Myers & Co., Inc. v. World Projects Int'l, Inc.*, 903 F.Supp. 353 (N.D.N.Y.1995). Nonetheless, because the facts alleged give rise to a Title IX claim, and all parties have proceeded on that theory in these motions, the court finds that jurisdiction does exist.

("the boards" or "the board exam"), a test that students were required to pass in order to go on to their fourth year of osteopathic studies. See Schiowitz Aff. at ¶ 7, 8,13 & Ex. J. As noted *supra,* she commenced her action in state court one and a half years later, in July 1999.

The plaintiff's claims regarding Mancini's alleged harassment and her responses to it are relevant to this motion, and the court thus sets forth the pertinent allegations in detail. In her Amended Complaint, Ms. Folkes alleges the following instances of sexually harassing behavior by Dr. Mancini:

1) in April 1993, Mancini touched the plaintiff's shoulder and back while he was giving a lecture in a classroom at NYCOM [2];

2) on or about May 18, 1993, Mancini put his hand on plaintiff's knee and started to move it up toward her thigh, and told her he could see her panties (¶¶ 13–14);

3) on or about May 21, 1993, while in an elevator on campus, Mancini pressed his body against plaintiff's, patted her buttocks, and put his hand between her thighs (¶ 15);

4) on or about August 17, 1993, Mancini patted plaintiff on the buttocks (¶ 16);

5) on or about October 22, 1993, Mancini asked plaintiff if she "likes white guys," and whether she would date him or other white men (¶ 17);

6) on or about November 4, 1993, in Mancini's office, Mancini asked plaintiff if she had seen a tape of a Halloween party that depicted an act of simulated fellatio and asked if she performed that act with her boyfriend. Mancini also asked if it was true that black men were

better in bed than white men; on this same occasion, Mancini stood in front of plaintiff, grabbed her shoulders and tried to push her head down to his groin. When he did so, his zipper was open and his penis was exposed and erect (¶¶ 18–19);

7.) on or about December 8, 1993, Mancini told plaintiff it was difficult for blacks, especially black females, to succeed in the medical profession, and told her she should be "rubbing elbows with the right people" (¶ 20);

8.) on or about December 18, 1993, Mancini asked plaintiff what she was willing to do to pass his course (¶ 21);

9.) on or about April 12, 1994, Mancini told plaintiff no one could come to his office unless he wanted them to, that he could make it very difficult for someone, and that she should not even attempt to take Part One of the board exams because she wasn't going to pass her second year courses (¶ 22);

10.) on or about April 22, 1994, Mancini told plaintiff that NYCOM was starting a five year program for students who had difficulty with their school work, and said that there were "too many blacks in the school" (¶ 25);

11.) on or about September 13, 1994, Mancini rubbed his genitals while talking to plaintiff and asked her to sit on his lap (¶ 26);

12.) in September 1994, while plaintiff was taking an examination, Mancini whispered in her ear that she looked attractive and asked what color underpants she was wearing. He also told her she shouldn't take the exam because she had already failed it (¶ 27);

13.) in August 1995, while in an elevator, Mancini stood close to plaintiff, put

---

**2.** This allegation does not appear in the Amended Complaint; Folkes raised it at her deposition. Folkes Dep. Tr., Ex. B to Britt Decl. at 20–24.

his hands on her shoulders, tried to kiss her and patted her on the buttocks (¶ 28);

14.) on or about August 14, 1996, Mancini got into an elevator with plaintiff, pressed against her, exposed himself, tried to place plaintiff's hand on his penis and told her that no one would know and that nothing could happen to him because he had been at NYCOM for years; when she rejected his advances, he told her she would not graduate and that he would see to it that she failed the Boards because he was the gatekeeper (¶¶ 29–31);

15.) on May 14, 1997, Mancini placed plaintiff's hands on his genitals and told her she was not going to graduate and she should have listened to him when he asked her to perform oral sex on him (¶ 33). This event allegedly occurred in a parking lot at NYCOM.

The plaintiff claims that she rejected all of Mancini's advances, and took the following steps: in May 1993, she went to Dr. Jerome Blue, then Dean of Minority Affairs at NYCOM, to seek help. Ms. Folkes's deposition testimony about her conversation with Dr. Blue is somewhat contradictory. She claimed that she told Blue that Mancini touched her thigh and commented on her panties (Folkes Dep. Tr., Ex. B to Britt Decl. at 32), but she later said that she refused to tell Dr. Blue details of the incident, even though he asked her to. Instead, she asked for a transfer, and acknowledged that "it didn't appear that Dr. Blue knew what was going on, because I didn't give him any details." Tr. at 36–37.

Plaintiff returned to Dr. Blue in November of 1993, immediately after the incident in which Mancini allegedly pushed her head toward his exposed penis. Tr. 48–49. Again, plaintiff's testimony about exactly what she told Dr. Blue is ambiguous. She said that she told him about "what had just happened with Dr. Mancini," but then stated that she told Blue only that Mancini was touching her "on the behind" and she wasn't comfortable with it because it was inappropriate. She admitted that she had not told Dr. Blue that Mancini tried to push her head toward his exposed penis. Tr. at 49–51. She also testified to having told Blue that Mancini talked about white men and black men in bed. Tr. at 52–53. She reiterated her request for a transfer. See Pl's Aff. in Opp. ¶ 6. According to Folkes, Blue agreed to meet with Mancini to discuss the situation with him. *Id.*

Plaintiff's next alleged meeting with Blue took place a month later, in December 1993, when she went to his office and asked him what had happened in his meeting with Mancini. Tr. at 54. At that time, Folkes testified, Dr. Blue told her he wouldn't let anything happen to her, even if he had to stand on a desk and stomp his feet, and that he and Mancini had met and "agreed to disagree." Tr. at 56. The next meeting occurred around April 1994, when Folkes went to Blue to discuss Mancini's threats that she would not pass her second year courses and should not plan on taking the board exams. Folkes stated that Blue reiterated his comment that he wouldn't let anything happen to her even if he had to stand on a desk and stomp his feet. Tr. at 60. At that point, Folkes was "comfortable" (Tr. at 56) and "satisfied" (Tr. at 61) with the steps Blue was taking and believed that she would be helped. This was Folkes' last meeting with Blue, and he left NYCOM sometime in the spring of 1994. Thus, the only meeting with Blue at which Folkes complained about sexual harassment was the one that took place in November 1993, when she allegedly told him that Mancini patted her buttocks and referred to the sexual prowess of white and black men.

In the summer of 1994[3], Folkes says that she went to Dr. Eileen DiGiovanna to discuss the situation with Mancini. Dr. DiGiovanna was at that time Assistant Dean for Student Affairs; as of 1997, she became Associate Dean for Student Affairs. DiGiovanna Aff. at ¶ 1. The Office of the Assistant Dean for Student Affairs is authorized by NYCOM to hear and investigate all student complaints of discrimination and sexual harassment. *Id.* at ¶¶ 7, 10. The plaintiff testified at her deposition that when she spoke to Dr. DiGiovanna during the summer of 1994, she told her that Mancini whispered in her ear during exams that she would not pass[4], tried to push her "in front of his cro[t]ch," and touched her on the buttocks. Tr. at 65 & 68. Before Folkes could tell DiGiovanna more details, the plaintiff claims, DiGiovanna told her to go to Mark Nivet, the person who took Dr. Blue's place as Director of Minority Affairs, and asked no follow up questions. Folkes also testified that DiGiovanna, after hearing of the three incidents, said that "Dr. Mancini [is] like that." Tr. at 68–69. Folkes and DiGiovanna then discussed Folkes's schedule and other academic matters. *Id.* This was the only meeting that the plaintiff had with Dr. DiGiovanna. Tr. at 69. The plaintiff also testified that, although she did go to Mark Nivet's office, she did not tell him about Mancini, because she was afraid he might be a friend of Mancini's. Tr. at 66–67.

The fact that Folkes did not complain to anyone at NYCOM after the summer of 1994 has been deemed admitted.

## DISCUSSION

Both the school and the individual defendant have moved for summary judgment dismissing the federal claims against them. NYCOM and Mancini further urge the court to dismiss the state claims or to remand them to state court if judgment is entered dismissing the federal claims.

### A. Summary Judgment Standards:

" 'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.' " *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F.Supp.2d 174, 180 (E.D.N.Y.2000) (quoting *In re Blackwood Assocs., L.P.* 153 F.3d 61, 67 (2d Cir.1998) and citing Fed.R.Civ.P. 56(c) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998). If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996).

The trial court's responsibility is " 'limited to discerning whether there are any genuine issues of material fact to be

---

**3.** In her Affidavit in Opposition to the motion, Folkes mistakenly states that she went to see Dr. DiGiovanna in the summer of 1995 (see ¶ 19), and the error is repeated in the plaintiff's Memorandum in Opposition at page 8. In her deposition, however, the plaintiff makes clear that the visit to Dr. DiGiovanna took place in 1994. See Folkes Dep. Tr. at 63.

**4.** There is an inconsistency in this part of the plaintiff's testimony. She claims that she told Dr. DiGiovanna about the whispering sometime during the summer of 1994, but she alleges that the whispering incident did not take place until September of 1994. See Amended Complaint at ¶ 12.

tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 522 (2d Cir.1996) (quoting *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish*, 85 F.Supp.2d at 180 (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548)).

These standards are applied in civil rights cases as well as other contexts. One court has noted that "[n]otwithstanding the care with which the court must treat employment discrimination cases, 'the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation. To overcome a properly asserted motion for summary judgment, a non moving party must do more than simply show that there is some metaphysical doubt as to the material facts and must come forward with specific facts showing that there is a genuine issue for trial.'" *Marks v. New York Univ.*, 61 F.Supp.2d 81, 88 (S.D.N.Y.1999) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)).

A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the nonmoving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of sum-

mary judgment is proper." *Marks*, 61 F.Supp.2d at 88. Where, however, evaluation of the non-movant's proof rests on the credibility of the non-movant versus the movant, a genuine issue exists and summary judgment cannot be granted. "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *See* Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, Vol. 10A, § 2726 (quoting Advisory Committee Notes to 1963 amendment of Rule 56(e)).

## B. Rule 56.1 Statements:

Summary judgment motions in this district are subject not only to the standards applicable to Fed.R.Civ.P. 56(c), but to the Local Rules for the United States District Courts for the Southern and Eastern Districts as well. Local Civil Rule 56 requires that both the movant and the opponent on a summary judgment motion submit statements of the material facts as to which they contend there are or are not genuine issues to be tried. Loc. Civ. R. 56(a) & (b). The rule also provides that "All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Loc. Civ. R. 56(c). And, each statement of material fact by a movant or opponent "must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Loc. Civ. R. 56(d).

■ NYCOM and Mancini argue that the plaintiff's Rule 56.1 statement is "wholly defective" in that it does not controvert the material facts set forth by the defendants, nor does it contain any citations to

evidence. Thus, the defendants urge, the facts set forth in the defendants' Rule 56.1 statements should be deemed admitted as a matter of law. The defendants are correct that the plaintiff's Rule 56.1 statement is defective in its failure to controvert the material facts set forth in the defendants' Rule 56.1 statements or to cite to any admissible evidence whatsoever, and the facts set forth in the defendants' Rule 56.1 statements are deemed admitted as a matter of law. *See, e.g., Alleva v. Department of the Treasury,* 2001 U.S. Dist. LEXIS 9963, at *1 n. 1 (E.D.N.Y. Mar. 16, 2001) (defendant's Rule 56.1 statement of facts deemed admitted as matter of law where plaintiff failed to submit counter statement) (citing Local Rule 56.1(c) and *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998)); *see also Elgamil v. Syracuse Univ.,* 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 21, 2000) (defendant's Rule 56.1 statement of facts deemed admitted as matter of law where plaintiff failed to comply with Northern District Local Rule 7.1(a)(3), similar to Local Rule 56.1(c), by submitting a counter statement that failed to admit or deny specific assertions and failed to contain a single citation to the record).

This means that the plaintiff has admitted all of the facts set forth in the Rule 56.1 Statement submitted by Mancini, which catalogues her various grades and her ultimate dismissal from the school on academic grounds, as well as her failure of the NBOME Board exam four times. She has also admitted the facts set forth in NYCOM's Rule 56.1 Statement, the most significant of which are that Folkes was terminated from the school for academic reasons, that the school's student handbook advises students to contact the Associate Dean of Student Affairs if the stu-

dent believes she has been a victim of discrimination, and that the plaintiff did not tell anyone at the school about the events that allegedly occurred in 1995, 1996 and 1997. The court thus deems these facts admitted.

## C. Title IX Claims:

The parties agree that the plaintiff is pursuing Title IX claims against both defendants. Title IX provides, in relevant part, that "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In construing Title IX, courts have applied some (but not all[5]) of the legal principles of Title VII. *See, e.g., Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 73–76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)(same rule should apply when a teacher sexually harasses and abuses a student as applies when a supervisor sexually harasses a subordinate under Title VII). Thus, under Title IX, a plaintiff may state a claim of discriminatory harassment based upon a hostile educational environment by alleging that:

(1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment; and (5) some basis for institutional liability has been established.

**5.** One difference between Title IX and Title VII is their statute of limitations. Another significant difference is the goal of each stat-

ute, compensation in the case of Title VII, and protection in the case of Title IX, discussed *infra* section C(4)(a).

*See Babcock v. Frank,* 783 F.Supp. 800, 808 (S.D.N.Y.1992).

■ To establish institutional liability for sexual harassment under Title IX, the plaintiff must show that "an official who . . . has authority to address the alleged discrimination and to institute corrective measures on the [institutional] recipient's behalf has actual knowledge of discrimination . . . and fails adequately to respond." *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Moreover, the official's response "must amount to deliberate indifference to discrimination." *Id.*

Here, Defendant Mancini argues that Title IX does not apply to individuals, and the claim must be dismissed as against him as a matter of law. NYCOM argues that the plaintiff has presented no triable issue of fact regarding NYCOM's institutional liability and the Title IX claim against NYCOM must thus be dismissed as a matter of law. The court will first address Mancini's argument.

### 1.) Title IX Applies only to Recipients of Federal Funds, not to Individuals

■ The plaintiff asserts Title IX claims against both NYCOM and Dr. Mancini individually. The weight of authority, however, holds that only the institutional recipient of federal funds can be held liable under Title IX, and individuals, who are not recipients, cannot be held liable. *See Hayut v. State Univ. of N.Y.,* 127 F.Supp.2d 333, 338 (N.D.N.Y.2000) (collecting cases); *see also Loren v. Feerick,* 1997 WL 441939, at *6, n. 10 (S.D.N.Y. Aug. 6, 1997), (finding it unnecessary to rule on the issue, but noting that "many courts have concluded that a professor . . . who allegedly harasses a student cannot be held liable for sexual harassment under Title IX . . ."), *aff'd,* 1998 WL 398805, 152 F.3d 919 (2d Cir.1998). Thus, defendant Robert Mancini's motion for summary judgment as to the Title IX claim is granted.

The issues regarding the Title IX claim against NYCOM are not so easily resolved.

### 2.) Notice to Person with Actual Authority

The Supreme Court has held that, in order to establish a basis for institutional liability and to recover damages, a Title IX litigant must demonstrate that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the federal funding recipient's behalf" must have had actual knowledge of discrimination and failed to adequately respond. *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Neither constructive notice nor apparent authority will suffice.

Here, the plaintiff claims that she went to Dr. Jerome Blue, then Dean of Minority Affairs, in 1993 and 1994, and to Dr. Eileen DiGiovanna, then Assistant Dean of Students, in summer 1994, and told them some details of the harassment by Mancini. It is undisputed that the plaintiff's last meeting with either Dean took place in the summer of 1994 and that Folkes reported no incidents occurring after that time. The court will assume, for the purposes of this motion, that both professors had actual authority to redress the discrimination, thus satisfying the *Gebser* standard regarding notice to an individual with actual authority. Dr. DiGiovanna acknowledges that she is the individual at NYCOM charged with responsibility for handling student claims of discrimination (DiGiovanna Aff. at ¶¶ 7 & 9), and NYCOM does not dispute Dr. Blue's actual authority, although the Court questions whether Dr. Blue had the requisite authority, and

leaves that issue open for resolution at trial.

NYCOM argues that the plaintiff cannot establish institutional liability under these circumstances because the requisite actual notice is lacking. The school urges the court to find that even if the plaintiff spoke with Drs. Blue and DiGiovanna about some of the 1993 and 1994 incidents, those incidents, along with the 1995 incident, are time barred, and there was no actual notice to any authority figure at NYCOM of the 1996 and 1997 incidents. The success of this argument rests, first, on a finding that the 1993, 1994 and 1995 claims are time-barred, and second, on an interpretation of *Gebser* that would require actual notice of specific incidents, not merely actual notice of discriminatory conduct. While the court agrees that all of the plaintiff's pre–1996 claims are time-barred, it does not accept the defendant's interpretation of the *Gebser* notice requirement, for the reasons set forth below.

### a.) What notice does *Gebser* require?

*Gebser* found that because the "express remedial scheme under Title IX is predicated upon notice to an 'appropriate person' under § 1682 and an opportunity to rectify any violation," the implied damages remedy in Title IX cases should be "fashioned along the same lines." 524 U.S. at 290, 118 S.Ct. 1989. Accordingly, the Court held that in cases that do not involve official policy of the recipient entity, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has *actual knowledge of discrimination in the recipient's programs* and fails to adequately respond." *Id.* (emphasis added).

The parties have not cited, and research has not revealed, any Second Circuit or Eastern District cases interpreting the *Gebser* notice requirement. The Southern District has noted, in a case involving NYCOM, that although "the actual knowledge standard has been applied repeatedly since *Gebser* (citations omitted) ... its contours have yet to be fully defined." *Crandell v. New York College of Osteopathic Med.*, 87 F.Supp.2d 304, 320 (S.D.N.Y.2000). The *Crandell* court found that, under this standard, "the institution must have actual knowledge of at least some incidents of harassment in order for liability to attach ... It is equally evident, however, that actual knowledge of every incident could not possibly be required, as this would burden the plaintiff unfairly in cases of frequent harassment to report many separate incidents to the appropriate authorities and would oblige the court to determine whether each incident alleged was reported and therefore is actionable." *Id.* (emphasis added). The *Crandell* court went on: "Suffice it to say, in light of *Gebser*, that the institution at minimum must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Id.* This court agrees that *Gebser* does not require notice of every alleged incident of sexual harassment.

This view is at odds with the interpretation of *Gebser* reached by the Fourth Circuit in *Baynard v. Malone*, 268 F.3d 228, 237–38 (4th Cir.2001). *Baynard* involved alleged sexual abuse of a sixth grader by a teacher, under circumstances in which the abused child did not notify the school of the abusive incidents, but the school principal had been given information by several individuals that the teacher was acting inappropriately. One of the people who spoke to the principal was a former student of the teacher's, now an adult, who

claimed that he had been abused by the teacher and that the teacher was a pedophile who posed a serious risk to other students. The principal did nothing in response to any of the warnings, but the Fourth Circuit determined that the school district could not be held liable under Title IX because it had no actual notice of the abuse of the plaintiff child, Jackson Baynard.

In so holding, the Fourth Circuit interpreted *Gebser*'s requirement of "actual knowledge of discrimination in the recipient's programs" to require "a showing that school district officials possessed actual knowledge of the discriminatory conduct in question." 268 F.3d at 237The court noted that if there were any doubt as to the import of the actual knowledge requirement in *Gebser*, that doubt is dispelled by the subsequent opinion of the Supreme Court in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The *Baynard* court wrote: "in recounting the Gebser holding, the Davis court stated, 'In Gebser, we concluded that a recipient of federal education funds may be liable in damages under Title IX where it is deliberately indifferent to known acts of sexual harassment by a teacher.'" 268 F.3d at 238 (quoting *Davis*, 526 U.S. at 641, 119 S.Ct. 1661). The *Baynard* court also quoted *Davis* as interpreting *Gebser* to mean that a school district "could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher student harassment of which it had actual knowledge." *Id.* at 238 (quoting *Davis*, 526 U.S. at 642, 119 S.Ct. 1661).

This court does not accept the Fourth Circuit's reading of *Gebser*. In the undersigned's view, "actual knowledge of discrimination in the recipient's programs,"

the requirement set forth in *Gebser*, is simply not the same thing as knowledge of each and every specific discriminatory act, and *Gebser*'s holding cannot be stretched that far. Nor does the *dicta* in *Davis* require the opposite view.

In a well-reasoned dissent to the majority opinion in *Baynard*, Judge Michael of the Fourth Circuit disagreed with his colleagues' holding regarding notice, suggesting that "Gebser leaves room for an actual notice standard that requires the appropriate official to have actual knowledge of at least a substantial risk of sexual abuse (or discrimination)." 268 F.3d at 240 (Michael, J., concurring in part and dissenting in part). In his dissenting opinion, Judge Michael suggested that "By insisting that actual notice cannot be satisfied by anything less than actual knowledge of current abuse, the majority's new standard 'sets the bar too high.'" *Id.* (quoting *Doe v. School Admin. Dist. No. 19*, 66 F.Supp.2d 57, 63 (D.Me.1999)). Pertinent to this case, the dissent observed that the standard applied by the majority in *Baynard* would let a recipient entity "off the hook if its official knew that a teacher had abused a student in the past as long as the official did not know of any current abuse." *Id.* Finally, the dissent rejected the majority's reliance on *Davis*, noting that while *Davis* reaffirmed *Gebser*'s rejection of the constructive notice and respondeat superior theories of liability, it "did not clarify what constitutes actual notice because notice was not at issue [in Davis]." *Id.* at 240. We agree.

■ The strict standard articulated by the *Baynard* majority is not consistent with the objectives of Title IX, notably to provide protection for individuals against discriminatory or abusive practices based on sex in schools that receive federal funds. *See Gebser*, 524 U.S. at 286, 118 S.Ct. 1989. This court adopts the reason-

ing in *Crandell*, and holds that the actual notice requirement is met when an appropriate official "possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." 87 F.Supp.2d at 320. This comports with the findings of other district courts that have addressed the issue. *See, e.g., Gordon v. Ottumwa Comm. Sch. Dist.*, 115 F.Supp.2d 1077, 1082 (S.D.Iowa 2000) (actual notice "does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student. At some point . . . a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children."); *Massey v. Akron City Bd. Of Educ.*, 82 F.Supp.2d 735, 744 (N.D.Ohio 2000) ("For actual notice to exist, an agent of the school must be aware of facts that indicate a likelihood of discrimination."); *Frederick v. Simpson College*, 149 F.Supp.2d 826, 838 (S.D.Iowa 2001) (actual notice requires "actual notice . . . that [the teacher] was at risk of sexually harassing a student.").

Thus, the question here is whether, based on the alleged complaints lodged by the plaintiff with the two deans in 1993 and 1994, the plaintiff has raised an issue of material fact as to whether NYCOM had "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *See Crandell*, 87 F.Supp.2d at 320.

### b.) What notice did the plaintiff actually give?

Close scrutiny of the plaintiff's deposition testimony, the only evidence she has advanced in regard to her notice to NY-

COM, demonstrates that her notice to the school was quite limited, given the seriousness and frequency of the incidents she relates in the amended complaint. In that complaint, the plaintiff alleges only that she went to Dr. Blue in 1993 and told him that she "did not feel comfortable at the school and asked for a transfer." Verified Am. Compl. at ¶ 35–36. The complaint contains no other allegations whatsoever about complaints to Dr. Blue or Dr. DiGiovanna. At her deposition, the plaintiff testified to more extensive notice.

As noted in the Background section, *supra*, her testimony in regard to her four alleged visits to Dr. Blue is somewhat contradictory. Putting aside the contradictions, Folkes alleges that she told Dr. Blue that Dr. Mancini had touched her buttocks (Pl. Dep. Tr. at 49–51), talked to her about white and black men's behavior in bed (*id.* at 52–53), and threatened her that she wouldn't pass her second year courses (*id.* at 60). The court cannot accept the plaintiff's claims that she told Blue about the more egregious incidents, because her testimony is self-contradictory, and she finally admitted that she had not told Dr. Blue about Mancini's alleged attempt to push her head toward his exposed penis (*id.* at 49–51), and she never told him about the "panties" incident (*id.* at 86).

The Amended Complaint and the plaintiff's deposition testimony suggest that, in her visits to Dr. Blue, Ms. Folkes focused on her academic worries and her wish for a transfer, not on allegations of sexual harassment. However, giving the plaintiff the deference she is due on this motion, her testimony regarding notice of sexual harassment to Dr. Blue raises an issue of material fact as to whether she told Blue that Mancini had patted her buttocks and alluded to the sexual behavior of black and white men.

The plaintiff alleges that in the summer of 1994, she went to Dr. DiGiovanna to discuss academic issues, and told her that Mancini tried to push the plaintiff "in front of his cro[t]ch," and touched her on the buttocks. Tr. at 65 & 68. She also claims that Dr. DiGiovanna referred her to Dr. Mark Nivet to discuss Dr. Mancini, but that the plaintiff did not do so, out of fear that Nivet was a friend of Mancini's. Drawing all reasonable inferences regarding the plaintiff's alleged complaints to Dr. DiGiovanna in the plaintiff's favor, as the court is bound to do on this motion, there is, then, some evidence that NYCOM was on notice, as of Summer 1994, that Dr. Mancini touched the plaintiff's buttocks and pushed her "in front of his cro[t]ch."

The court finds that these alleged acts, if proven, could rise to a level of harassment that was "sufficiently severe or pervasive as to alter the conditions of her education and create an abusive educational environment," and the plaintiff has raised an issue of material fact as to whether NYCOM had received sufficient actual notice of the alleged harassment by Mancini to give the school "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *See Crandell,* 87 F.Supp.2d at 320.

### c.) Credibility of the plaintiff's alleged notice:

In reaching its conclusion that an issue of material fact exists as to the notice issue, the court recognizes that both Dr.

Blue and Dr. DiGiovanna denied at their depositions that the plaintiff ever told them anything about sexual harassment by Mancini, although she did come to talk to them about her academic problems.[6] DiGiovanna Aff. at ¶ 11 & Ex. L, Blue Dep. Tr., at 21–24, 32–34, 36, 37, 39 & 48. Thus, this crucial issue of actual notice to an authority at NYCOM, indeed, a determinative issue on the entire Title IX claim, comes down to a question of credibility. Who will the jury believe—Gail Folkes or Drs. Blue and DiGiovanna? The court cannot make a determination of credibility on a motion for summary judgment and must find that a genuine issue of material fact exists as to whether Gail Folkes complained to NYCOM about Mancini's alleged harassment. As the Advisory Committee states in its Notes to the 1963 amendment of Rule 56(e): "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *See* Wright, Miller & Kane, *Federal Practice and Procedure,* Vol. 10A, § 2726. Thus, as noted *supra,* for purposes of this motion, an issue of material fact exists as to what notice, if any, the plaintiff gave to NYCOM regarding the incidents that allegedly occurred up to summer 1994.

### d.) Can the plaintiff's notice of time-barred claims satisfy the *Gebser* standard as to later claims?

NYCOM argues that, even if notice of each and every harassing incident is not

---

6. Other details regarding the plaintiff's credibility trouble the court. Ms. Folkes's mother, Meda Folkes, testified at her deposition that her daughter never told her that she was being harassed or touched inappropriately by someone at NYCOM, only that someone was "giving her a hard time." Ex. G to Murphy Aff. in Supp. of Motion for Summary Judgment. This contrasts with Gail Folkes's deposition testimony that she told her mother about the August 1996 elevator incident. Folkes' Dep. Tr. at 74. The court is also troubled by the plaintiff's failure to submit affidavits from the other people to whom she claims to have complained, Rosalie Castillo and especially Dr. Marzano. Nonetheless the court is required to abstain from making a credibility determination on this motion.

required, there is still no notice as to the 1996 and 1997 claims, because any notice that may have been given about the time barred 1993 and 1994 incidents cannot be used as evidence. In other words, NYCOM urges the court to rule that if the 1993 and 1994 incidents are time barred by the applicable statute of limitations, they are barred for all purposes, and any notice that NYCOM may have received in regard to those claims is a nullity.

As explained *infra*, the court agrees with NYCOM that the 1993–95 incidents are time barred, and the doctrine of continuing violation does not apply, but that finding does not support NYCOM's entitlement to summary judgment on the Title IX claim on the basis of lack of actual notice. The 1993–95 claims may be time barred for purposes of the plaintiff's recovery, but the notice allegedly given to the Deans regarding those claims may, in this court's view, be used as evidence of actual notice of Mancini's alleged discriminatory conduct. "Even if a jury were to find that there was no continuing violation, 'clearly established precedent dictates that [a] discriminatory act which is not made the basis for a timely charge can still be relevant background evidence in a Title VII proceeding.'" *Ramirez v. New York Presbyterian Hosp.*, 129 F.Supp.2d 676, 680 (S.D.N.Y.2001)(additional internal quotation marks omitted). The court finds that the same is true as to a Title IX proceeding. *See also Berger v. Port Auth. of N.Y. and N.J.*, 150 F.Supp.2d 504, 507 (E.D.N.Y.2001) (Even where continuing violation exception did not apply to save plaintiff's time-barred claims, court would consider evidence of those claims on theory that it was relevant background to plaintiff's timely claim)(citing *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001)("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.")).

### e.) Issues of material fact regarding other Title XI factors.

As explained *supra*, the plaintiff has raised an issue of material fact as to the actual notice requirement articulated in *Gebser*. *Gebser* also held that institutional liability could only be imposed where the school's response to notice amounted to "deliberate indifference to discrimination." 524 U.S. at 290, 118 S.Ct. 1989. The court finds that Dr. Blue's reaction to the plaintiff's complaints cannot be construed as deliberate indifference. The plaintiff herself testified that Dr. Blue spoke to Dr. Mancini and that she was satisfied with the steps that Blue took. Folkes Dep. Tr., Ex. B to Britt Decl., at 61.

Dr. DiGiovanna's alleged response is a different matter. Folkes claims that Dr. DiGiovanna, the person specifically designated by the school to hear complaints of discrimination, declined to listen to any of the details of Folkes's claims, and referred her instead to Dr. Nivet. *Id.* at 68–69. If proven, this fact could lead to a finding that deliberate indifference occurred, and a material issue thus exists. Also, as noted earlier, the nature of the incidents allegedly reported to Blue and DiGiovanna, including the patting of the plaintiff's buttocks and an attempt to force her face toward Mancini's penis makes them "sufficiently severe or pervasive as to alter the conditions of [Folkes's] education and create an abusive educational environment."

The court now turns to the issue of timeliness of the plaintiff's claims.

### 3.) Title IX Claims Have a Three–Year Statute of Limitations.

Title IX does not specify a statute of limitations, but courts in this Circuit have

applied the three year statute of limitations applicable to personal injury actions. *See Torre v. Columbia Univ.*, 1998 WL 386438 (S.D.N.Y. July 8, 1998) (citing *Loren v. Feerick*, 1997 WL 441939 (S.D.N.Y. Aug. 6, 1997)), *aff'd*, 189 F.3d 462 (2d Cir.1999); *Benzo v. New York State Div. of Human Rights*, 1997 WL 37961 (S.D.N.Y. Jan. 29, 1997), *aff'd*, 1998 WL 74843, 141 F.3d 1151 (2d Cir.1998)). In New York, personal injury claims must be filed within three years from the time the cause of action accrued. N.Y. C.P.L.R. § 214(5). The court assumes, for purposes of this motion, that plaintiff commenced her action by service and filing of the Summons With Notice on July 12, 1999. Thus, on their face, all claims that occurred prior to July 12, 1996, which includes all of plaintiffs' claims except for those alleged to have occurred on August 14, 1996 and May 14, 1997, are time barred unless they are deemed to be part of a continuing violation, discussed *infra*.

### 4.) Application of the "Continuing Violation" Doctrine:

■ Folkes argues that the incidents occurring outside the three year limitations period were part of a continuing violation and should not be time barred. The Second Circuit has recognized a continuing-violation exception in some civil rights actions, including Title VII and the ADEA *(see Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906–07 (2d Cir.1997)), and 42 U.S.C. § 1983 *(see Cornwell v. Robinson*, 23 F.3d 694 (2d Cir.1994)). Under the exception as applied in Title VII cases, "a plaintiff who files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination extends the limitations period for all claims of discriminatory acts committed under that policy even if those acts, standing alone, would have been barred by the statute of limitations."

*Lightfoot*, 110 F.3d at 907. It is a " 'limited exception' to the statute of limitations," considered by some courts to be "disfavored in this circuit," and "applicable only under the most 'compelling circumstances.' " *Petrosky v. New York State Dep't of Motor Vehicles*, 72 F.Supp.2d 39, 48 (N.D.N.Y.1999) (collecting cases in support of these views).

#### a.) Does the continuing violation doctrine apply to Title IX claims?

Neither party has cited to a case that has applied the continuing violation theory in a Title IX case, and the exception may well be a poor fit with the goals of Title IX. In *Gebser*, the Supreme Court explained the differences between Title VII and Title IX, noting that Title IX, like Title VI, "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." 524 U.S. at 286, 118 S.Ct. 1989. It is that contractual framework that "distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition," and which applies to all employers, not just recipients of federal funds, and aims broadly to "eradicate discrimination throughout the economy." *Id.* at 286–87, 118 S.Ct. 1989. Thus, "whereas Title VII aims centrally to compensate victims of discrimination," and to "make persons whole for injuries suffered through past discrimination," Title IX "focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds." *Id.* at 287, 118 S.Ct. 1989.

*Gebser* shows the Supreme Court's reluctance to extend the reach of Title IX beyond that imposed by Congress. *Id.* at 287, 118 S.Ct. 1989 ("Title IX's contractual nature has implications for our construction of the scope of available remedies.

When Congress attaches conditions to the award of federal funds under its spending power, ... as it has in Title IX and Title VI, we examine closely the propriety of private actions holding the recipient liable in monetary damages for noncompliance with the condition.") This reasoning led the *Gebser* Court to impose the actual notice standard discussed *supra*, and leads this court to question the advisability of applying the oft-disfavored continuing violation exception to Title IX claims. We need not reach a holding on that issue, however, because, even assuming that the exception is theoretically applicable to Title IX claims, it does not apply under the circumstances presented here.

### b.) **The circumstances of this action bar application of the exception.**

As noted earlier, to establish the application of the continuing violation doctrine in this Circuit, a plaintiff must show that the defendant had an "ongoing discriminatory policy or practice" or that it permitted "specific and related instances of discrimination [to] continue unremedied for so long as to amount to a discriminatory policy or practice." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996); *see also Lightfoot*, 110 F.3d at 906. The relevant defendant in this Title IX action is, for the reasons stated *supra*, the school. Thus, there must exist a material issue of genuine fact as to whether NYCOM had an ongoing policy or practice of discrimination or whether it permitted related instances of discrimination to continue for so long as to amount to such a policy.

Blue's and DiGiovanna's alleged knowledge of incidents of discrimination occurring in 1993 and 1994 and their alleged failure to take any action to address the situation until this lawsuit was commenced in 1999 constitute some evidence of such a policy, and arguably create an issue to be resolved by a trier of fact. *See Kass v. A.L.U.F. Plastics, Inc.*, 1999 WL 961780, at *1 (S.D.N.Y. Oct. 20, 1999) (Court found issue of material fact as to continuing violation exception, even where only evidence offered was plaintiff's internally inconsistent deposition testimony concerning some details, finding that "[a]lthough the inconsistency of the deposition testimony raises some questions, for purposes of this [summary judgment] motion, the portions to which she points must be assumed to be credible.")

The defendant argues, however, that other circumstances present here bar the application of the continuing violation exception. Both parties agree, for example, that for the continuing violation theory to apply, the timely claims must be actionable. In "evaluating an alleged continuing violation, 'the critical question is whether any present violation exists.'" *Berger*, 150 F.Supp.2d at 507 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558–59, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) and citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993)(continuing violation only applies where EEOC charge is timely as to at least one incident of discrimination)). The defendants argue that the timely claims are not actionable because no actual notice of the 1996 and 1997 incidents was given to an appropriate school official, and that the continuing violation theory thus cannot apply. For reasons discussed in detail *supra*, there are material issues of fact regarding the actual notice standard in this case, and the court cannot find as a matter of law that the 1996 and 1997 claims are not actionable on that basis.

█ The court agrees with defendants, however, that under the circumstances presented here, the exception does not apply. As a threshold matter, courts have held that a plaintiff must "clearly assert a continuing violation in both her EEOC fil-

ing and her Complaint in order to invoke the doctrine to circumvent the statute of limitations." *Benzo v. New York State Div. of Human Rights*, 1997 WL 37961, at *5 (Jan. 29, 1997) (citing *Cook v. Pan American World Airways, Inc.*, 771 F.2d 635, 646 (2d Cir.1985); *O'Malley v. GTE Service Corp.*, 758 F.2d 818, 821 (2d Cir. 1985)); *see also Oshinsky v. New York City Hous. Auth.*, 2000 WL 218395, at *7 (S.D.N.Y. Feb. 23, 2000) (citing *Alfano v. Costello*, 940 F.Supp. 459, 470 (N.D.N.Y. 1996)). There are no such allegations in the plaintiff's original complaint or amended complaint.

At the time that the plaintiff filed her first complaint in state court, in January 2000, even a cursory review of the statutes of limitations governing the plaintiff's claims would have revealed serious problems with timeliness for many of those claims, and the plaintiff could and should have alleged a continuing violation. The fact that the original complaint was framed entirely in terms of state law claims does not alter this conclusion, inasmuch as a continuing violation exception "similar to" the one applied to federal civil rights claims has been found to apply to claims under New York's Human Rights Law. *See Kass*, 1999 WL 961780, at *1 (citations omitted). Thus, the exception does not apply for this reason alone. Other substantive considerations also bar its application.

The defendants argue that under the "*Berry*" standard, the plaintiff's claims cannot, as a matter of law, qualify for application of the continuing violation exception, and the court agrees. *Petrosky* aptly noted that application of the exception has been found to be "confusing and inconsistently applied," 72 F.Supp.2d at 49 (quoting Ramona L. Paetzold & Anne M. O'Leary–Kelly, "Continuing Violations and Hostile Environment Sexual Harassment:

When is Enough, Enough?", 31 Am. Bus. L.J. 365, 382 (1993)). To resolve the inconsistency, *Petrosky* looked to a Fifth Circuit decision, *Berry v. Board of Supervisors of La. State Univ.*, 715 F.2d 971 (5th Cir.1983), as a comprehensive and specific standard for determining when a continuing violation has been established. 72 F.Supp.2d at 49.

The three factors looked to in *Berry* are the "relatedness" of the various discriminatory acts, their frequency, and the "degree of permanence," which looks to whether and when the plaintiff had notice that she was a victim of discrimination. 715 F.2d at 981–82. Of these three, the last is the most significant. While the first two *Berry* factors might arguably weigh in favor of the plaintiff here, the third and most important factor, the "degree of permanence" of the alleged acts, weighs decidedly against the exception's application.

This factor has been explained as asking "does the act have that degree of permanence that ought to have made the employee aware that the time to assert her rights had arrived?" *Petrosky*, 72 F.Supp.2d at 51 (quoting *Davis v. City Univ. of N.Y.*, 1996 WL 243256 (S.D.N.Y. May 9, 1996)). The *Petrosky* court explained that this factor "acts essentially as a notice requirement. When discriminatory acts are of such a duration and form as to place the employee on notice of their discriminatory effect, a duty is created to assert one's rights." *Id.* at 51; *see also Pollis v. New Sch. For Social Research*, 132 F.3d 115, 119 (2d Cir.1997) ("The statute of limitations requires that [employment discrimination] claims be brought promptly to protect the defendant against stale or fabricated claims.")

Applying this reasoning, the court in *Petrosky* found that where "a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues

that she was a victim of actionable harassment, she cannot reach back and base her suit on conduct that occurred outside the statute of limitations." 72 F.Supp.2d at 51. Thus, the question becomes whether and when Folkes was on notice that she may have been the victim of sexual harassment. Folkes's allegations and deposition testimony make clear that she perceived Mancini's alleged treatment of her as sexual harassment from very early on. Certainly, no one could be subjected to the alleged November 4, 1993 incident, in which Mancini allegedly pushed Folkes's head toward his exposed, erect penis and not know that this was, at the least, sexual harassment. For purposes of Folkes's Title IX claim, she alleges that she went to Blue and DiGiovanna in 1993 and 1994 to complain about Mancini's sexual harassment of her. She thus admits that she knew she was being harassed as early as 1993. Still, Folkes waited until July 1999, six years after the alleged harassment began, and a year and a half after she was terminated from the school, to bring a lawsuit. The court finds that Folkes was on notice that she was being sexually harassed at least as early as November 1993; her delay of almost six years weighs strongly against permitting her now to rely on a continuing violation. Indeed, one court has held that where a plaintiff "knew from the beginning that she was being sexually harassed," the continuing violation doctrine does not apply. *Bolt v. Norfolk Southern Corp.*, 22 F.Supp.2d 512, 517(E.D.Va.1997). This requires that the third and most significant *Berry* factor be weighed against her.

Courts have found long delays to mandate denial of the continuing violation exception even without reference to *Berry*. "Several courts in this circuit have refused to apply the continuing violation doctrine when presented with ... evidence that a plaintiff knew he had been the victim of

discrimination but delayed in pursuing his legal rights." *Berger*, 150 F.Supp.2d at 507 (citing *Johnson v. Nyack Hosp.*, 891 F.Supp. 155, 165–66 (S.D.N.Y.1995)). The *Berger* court noted that it "agreed with the rationale behind these cases that the central purpose of the continuing violation doctrine is to protect plaintiffs who could not have known that they should have sued earlier." *Id.*

Under these circumstances, Folkes's invocation of the continuing violation exception to the statute of limitations is rejected, and all claims based on pre-July 1996 conduct are time-barred. The continuing violation doctrine is a limited exception to the statute of limitations, and cannot be applied to destroy the protections afforded by that statute, (*see Lightfoot*, 110 F.3d at 907–08), especially under the circumstances of this case and the goals of Title IX, set forth earlier.

Thus, the court finds that the continuing violation exception does not apply, and the plaintiff's claims pre-dating July 1996 are time-barred for recovery purposes.

### D. Title VI Claims:

Although neither party argues the Title VI claims in their motion papers, the plaintiff states in her Memorandum of Law in Opposition to the motion for Summary Judgment that she has "Alleged Sufficient Facts for a Jury to Find that the Sexual *and Racial* Harassment of Her was Sufficiently Severe or Pervasive Enough to Constitute a Sexually Hostile Learning Environment." Pl. Mem. of Law at 12 (emphasis added). And, in the Joint Proposed Pre–Trial Order submitted by the parties, the plaintiff states her intention to pursue a Title VI claim. For the reasons stated *infra*, the Title VI claim is dismissed as to both defendants.

■ Title VI is "parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs." *Gebser,* 524 U.S. at 289, 118 S.Ct. 1989. The two statutes "operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Id.* Thus, the reasoning that applies to Title IX cases applies to Title VI claims as well, and the plaintiff must demonstrate, *inter alia,* that the racial harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment; and that some basis for institutional liability has been established.

■ Here, the plaintiff asserts that Mancini asked her in October 1993 if she "liked white men," (Amended Complaint at ¶ 17) and in November 1993 "if it was true about black men." *Id.* at ¶ 18. He allegedly told her in December 1993 that it was "hard for blacks" in the medical profession (*id.* at ¶ 20), and in April 1994 that there were "too many blacks" at NYCOM. *Id.* at ¶ 25. These are the only comments of a racial nature that the plaintiff asserts. As a threshold matter, Title VI claims cannot be asserted against an individual defendant for the same reason that they cannot be asserted under Title IX—the individual is not a recipient of federal funding. Thus, the claim, even if viable, would have to dismissed as against Mancini. For several reasons, however, the claims are not viable.

■ Any Title VI claims are time-barred pursuant to the applicable three year statute of limitations, the last remark allegedly occurring in April of 1994, five years before the plaintiff brought her lawsuit. The continuing violation doctrine would not apply for all the reasons set forth *supra* in section C(4) and for the additional reason that no timely claim exists. *See Greenbaum v. Svenska Handelsbanken, NY,* 67 F.Supp.2d 228, 257 (S.D.N.Y.1999) ("Plaintiffs seeking to establish a continuing violation must meet a threshold requirement of showing that the alleged policy of discrimination not only created a discriminatory effect resulting from past violations, but resulted in an actual ... violation within the relevant time period.") (quoting *United Air Lines v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) for proposition that "emphasis should not be placed on mere continuity; the critical question is whether any present violation exists.")

Moreover, the comments, while inappropriate and offensive, do not rise to the level of severity or pervasiveness necessary to make out a claim of race discrimination under Title VI and, as a matter of law, cannot be said to have altered the conditions of Folkes's education to create an abusive environment. The October and November 1993 comments were essentially sexual, not racial, in nature. The December 1993 comment, that it was "hard for blacks" in the medical profession is difficult to evaluate out of context, but could have been made without any racial animus. The April 1994 comment, that there were "too many blacks" at NYCOM is certainly offensive, but is a single incident that does not rise to the level of severity necessary to make out a claim.

Finally, the only notice that the plaintiff arguably gave of racial discrimination was her alleged report to Dr. Blue in November 1993 that Mancini had talked to her about the sexual behavior of white and black men. This is simply not sufficient to have given NYCOM sufficient "knowledge of the harassment that it reasonably could have responded with remedial measures to

address the kind of harassment upon which plaintiff's legal claim is based." *See* *Crandell,* 87 F.Supp.2d at 320.

Thus, the Title VI claims are dismissed as against both NYCOM and Mancini.

### E. State Law Claims:

Both defendants have moved for summary judgment on the state law claims or for remand of those claims to state court. In the Amended Verified Complaint, the plaintiff asserts nine causes of action based on New York state law:

1.) Violation of N.Y. Exec. Law § 296(¶ 41);

2.) Intentional Infliction of Emotional Distress (¶¶ 50–51);

3.) Assault by Mancini(¶ 54);

4.) Violation of N.Y. Educ. Law § 6524(¶ 59);

5.) Breach of Contract by NYCOM (¶ 69);

6.) Interference with Contract by Mancini (¶ 72);

7.) Injunctive relief pursuant to N.Y. Exec. Law § 297;

8.) Punitive damages;

9.) Attorney's fees.

As a threshold matter, the court notes that demands for punitive damages and/or attorney's fees are not causes of action; they are demands for damages. Moreover, the plaintiff has admitted that she is not entitled to punitive damages. Jt. Pretrial Order at 6, § F. The seventh "cause of action," which seeks declaratory and injunctive relief pursuant to N.Y. Exec. Law § 297, is not a distinct cause of action, but seeks a particular form of relief based on the factual assertions in the complaint. Thus, there are six actual causes of action based on state law that are at issue on this motion.

The plaintiff's second and third causes of action, for intentional infliction of emotional distress and assault, are time barred, inasmuch as both causes of action carry a one year statute of limitations. *See* N.Y. C.P.L.R. § 215(3); *see also Niles v. Nelson,* 72 F.Supp.2d 13 (N.D.N.Y.1999) (statute of limitations for intentional infliction of emotional distress under New York law is one year). The fourth, fifth and sixth causes of action, all of which are based on the claim that Folkes was terminated from NYCOM for improper reasons, are without merit in light of the fact that Folkes's Counter Statement Pursuant to Rule 56.1 effectively admitted that she was terminated for academic reasons. See section B *supra.*

The Amended Complaint does not specify which section of Executive Law § 296 has been violated, but, in her section of the Proposed Joint Pre-trial order, she refers to sections 296(4) and (6). Jt. Pretrial Order at 2–3. Section 296(4) states that it is a discriminatory practice for an educational institution such as NYCOM "to deny the use of its facilities to any person otherwise qualified, by reason of his race, color, religion, disability, national origin, age or marital status." Denial on the basis of gender is not included in the list of protected classes, and the section is thus inapplicable to the plaintiff's claim of sexual discrimination. For the reasons stated above in regard to Folkes's Title VI claim, the plaintiff has presented wholly insufficient evidence of racial discrimination and cannot invoke section 296(4) on that basis. Finally, even if the section did cover gender based discrimination or Folkes had presented evidence of racial discrimination, the section could only apply factually to Folkes's termination from the college, which she had admitted was for academic and not discriminatory reasons.

Section 296(6) states that "it shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." Because the plaintiff has not shown that any issues of material fact apply to her section 296(4) claim or to any other provisions of New York's Human Rights Law, section (6) has no relevance.

In her Memorandum of Law in Opposition to the Motion for Summary Judgment, the plaintiff correctly cites to *Hayut*, 127 F.Supp.2d 333, 340–41, for the proposition that a college professor accused of sexual harassment could be held liable under New York Executive Law § 290, also called New York's Human Rights Law. Mem. in Opp. at 23. This court, however, cannot accept that reading of section 296(4), which, as noted earlier, expressly excludes gender as a protected class. While there are certainly arguments to be made that gender could have been included in the list, the fact remains that it was not, and it is not in this court's power to rewrite New York law. The state legislators know how to include gender as a protected class when they wish to do so, as is evidenced by section 296(1)(a), which prohibits employers or licensing agencies from discriminating on the basis of "age, race, creed, color, national origin, sex, disability, genetic predisposition or carrier status or marital status of any individual ..." (Emphasis added) See also sections 296(1)(b), (c), (d); (1–a)(b), (c), (d); 2(a); 2–a(a), (b), (c); 3–b; 5(a)(1), (a)(2), (a)(3), (b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (d), (f); (9)(a); and (13) (all prohibiting discrimination on the basis of "sex" in assorted contexts).

Thus, summary judgment is awarded to the defendants as to the first through sixth causes of action as set out in the Amended Complaint, and the eighth "cause of action," for punitive damages is deemed withdrawn by the plaintiff. Summary judgment is also granted as to the plaintiff's seventh "cause of action" for injunctive relief pursuant to Executive Law § 297, inasmuch as the other Executive Law claims are dismissed. Plaintiff's entitlement to attorney's fees on the basis of her Title IX claim will be decided at trial.

## F. The Rule 11 Motions:

Both defendants have moved for sanctions pursuant to Fed.R.Civ.P. Rule 11, which requires that a party or attorney who presents a claim must make a reasonable inquiry and represents that the claims have not been presented for any improper purpose and are "warranted by existing law or by a 'nonfrivolous argument for the extension, modification or reversal of existing law or the establishment of new law,'" and that the factual contentions either have factual support, or "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Nothing in the record supports a finding that these claims were brought for an improper purpose, and the findings in this order regarding the *Gebser* notice standard make clear that the plaintiff's argument that her alleged notice to NYCOM sufficed were not frivolous. Moreover, although this court has denied her argument that the continuing violation doctrine should apply and she failed to allege a continuing violation, that failure simply does not rise to the level necessary for the imposition of sanctions. Finally, although the only evidence put forth by the plaintiff consists of her own testimony that the alleged events occurred, and that evidence hinges on a determination of credibility, it

is evidence. The court finds no violation of Rule 11, and the motions are denied.

## SUMMARY OF RULINGS

The following rulings have been made on these motions:

1.) Dr. Mancini's motion for summary judgment is granted, and all claims against him shall be dismissed with prejudice.

2.) All state claims against NYCOM are dismissed with prejudice.

3.) All of plaintiff's claims that predate July 1996 are time-barred, and the continuing violation exception does not apply.

4.) The plaintiff may proceed to trial on her Title IX claim of sexual harassment against NYCOM involving incidents that allegedly occurred in 1996 and 1997. She must demonstrate, *inter alia*, that an official with authority at NYCOM had enough knowledge of Mancini's harassment that it reasonably could have responded with remedial measures and failed to do so.

5.) The plaintiff cannot proceed on any theory that she was dismissed from the school for any reason other than her own academic performance, nor can she attempt to prove that her failure of the board exams was somehow orchestrated by Dr. Mancini or anyone else at NYCOM.

The court also notes, that, despite the plaintiff's claim in the Joint Proposed Pretrial Order that she does not waive here right to a jury trial, that right has apparently already been waived. Fed.R.Civ.P. 38(b) provides that "Any party may demand a trial by jury by (1) serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading . . . and (2) filing the demand as required by Rule 5(d). Such demand may be indorsed upon a pleading of the party." None of the pleadings that have been filed

with this court reflect such a demand. Rule 38(d) provides that the "failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by jury." Thus, the plaintiff has waived the right to a jury trial and the trial will proceed as a bench trial before the undersigned.

The parties are ordered to appear for a pretrial conference on **May 6, 2002 at 12:00 noon.**

**SO ORDERED.**