Beatriz CARABELLO, mother and natural guardian of M.H., an infant, and Beatriz Carabello, individually, Plaintiff,

v.

The NEW YORK CITY DEPARTMENT OF EDUCATION, the City of New York, and Keith T. Matone, Defendants.

No. 09–CV–3775 (RRM)(JMA).

United States District Court, E.D. New York.

March 6, 2013.

Andrew Michael Laskin, Joel Harris Robinson, Robinson & Yablon PC, New York, NY, for Plaintiff.

Lesley Berson Mbaye, The New York City Law Department, New York, NY, for Defendants.

### ORDER ADOPTING REPORT AND RECOMMENDATION

ROSLYNN R. MAUSKOPF, District Judge.

By Motion filed on July 16, 2012, defendants New York City Department of Education, City of New York, and Keith T. Matone moved for summary judgment against plaintiff Beatriz Carabello. (Doc. Nos. 49–53.) By Order entered on August 16, 2012, this Court referred that motion to the assigned Magistrate Judge, the Honorable Joan M. Azrack, for a Report and Recommendation. On February 19, 2013, Judge Azrack issued a Report and Recommendation ("R & R") recommending that defendants' motion for summary judgment be granted as to all federal and state law claims. (Doc. No. 60.) Judge Azrack reminded the parties that, pursuant to Rule 72(b), any objection to the R & R was due on or before March 5, 2013. No party has filed any objection.

Pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72, the Court has reviewed the R & R for clear error and, finding none, concurs with the R & R in its entirety. *See Covey v. Simonton*, 481 F.Supp.2d 224, 226 (E.D.N.Y.2007). Accordingly, it is hereby ORDERED that: Defendant's motion for summary judgment is GRANTED, and the Plaintiff's amended complaint in the above matter is DISMISSED. The Clerk of the Court is directed to enter judgment accordingly, and close the case.

SO ORDERED.

*REPORT AND RECOMMENDATION*

AZRACK, United States Magistrate Judge:

Plaintiff Beatrice Carabello, on behalf of her infant daughter, M.H., brings this sexual harassment and retaliation suit under Title IX of the Education Law of 1972 ("Title IX"), 20 U.S.C. § 1681, against the New York City Department of Education ("DOE"), the City of New York (the "City"), and Keith T. Matone (collectively, "defendants"). Plaintiff also brings New York State law claims of negligent infliction of emotional distress and negligent supervision against all defendants. This action arises out of an instance of sexual abuse against M.H. by a fellow student, B.P., in a stairwell of New Utrecht High School ("New Utrecht") in Brooklyn, New York.

On September 1, 2009, plaintiff brought this action on her own behalf and on behalf of her daughter M.H. Compl. ¶ 1, ECF No. 1. Subsequently, plaintiff voluntarily dismissed with prejudice all claims brought on her own behalf, leaving only claims asserted on behalf of M.H. ECF No. 28.

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). ECF No. 49. On August 16, 2012, the Honorable Roslynn R. Mauskopf referred this motion to me for report and recommendation. The issues in this motion are: (1) whether defendants had actual notice of any prior physical, sexual harassment by B.P.; (2) whether defendants acted with deliberate indifference upon learning of any sexual harassment by B.P.; and (3) whether B.P.'s sexual abuse of M.H. was sufficiently severe, pervasive, or objectively offensive to deny her educational benefits. *See* Def.'s Mem. in Supp. of Mot. Summ. J. ("Def.'s Mem.") at 2, ECF No. 50; Pl.'s Mem. in Opp. to Def.'s Summ. J. ("Pl.'s Mem.") at 2, ECF No. 54. For the reasons set forth below, I respectfully recommend the Court grant defendants summary judgment on all claims.

**BACKGROUND**

In April 2009, M.H. was a ninth grade student at New Utrecht High School in Brooklyn, New York. Def.'s Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1") ¶ 3, ECF No. 52. This action arises out of a single incident of sexual abuse by B.P. against M.H. on April 30, 2009. *Id.* ¶ 17.

*1. Disciplinary Procedures at New Utrecht High School*

New Utrecht enrolls approximately 3,000 students in grades nine through twelve, employs 300 teachers, staff members, and administrators, and is administered by the DOE. Def.'s 56.1 ¶¶ 1–2; Decl. of Keith T. Matone in Supp. Mot. Summ. J. ("Matone Decl.") ¶ 3, ECF No. 51. Keith Matone is New Utrecht's Assistant Principal of Safety and Security and oversees daily operations of the deans and school safety aides. Matone Decl. ¶ 4. Matone also works closely with the Sergeant of the school safety agents, who are uniformed members of the New York Police Department assigned to New Utrecht. *Id.* On a daily basis, Matone addresses student disciplinary infractions and ensures that school officials investigate and report these incidents in accordance with the Chancellor's Regulations and DOE policies. *Id.* Whenever a teacher, student, or staff member makes a report of student misconduct, the first step is to have the individual prepare a written statement describing the incident, including the time and location. *Id.* ¶ 11.

The DOE has implemented a Disciplinary Code, which provides schools with guidance on how to properly discipline students, including a range of permissible disciplinary measures. *Id.* at ¶¶ 5–6; DOE

Citywide Standards of Discipline and Intervention Measures ("Disciplinary Code"), Decl. of Andrew M. Laskin ("Laskin Decl.") Ex. 9, ECF No. 56. Possible disciplinary responses include parent conferences, detention, exclusion from extracurricular activities, removal from a certain classroom, and suspension. Matone Decl. ¶ 6; Disciplinary Code at 18–24. There are two types of suspensions, a principal's suspension and a superintendent's suspension, both of which can vary in length depending on the infraction. Matone Decl. ¶ 7. Matone recommends principal's suspensions, which the New Utrecht principal approves, and superintendent's suspensions, which the DOE's Office of School and Youth Development approves. *Id.*

The DOE also supports a policy of "progressive discipline," which encourages schools to use guidance interventions to address behavior problems. *Id.* ¶ 5; Disciplinary Code at 2. These interventions can include guidance counselor sessions, parent conferences, peer mediation, and conflict resolution. Matone Decl. ¶ 5; Disciplinary Code at 4–6.

### 2. B.P.'s Disciplinary History Prior to April 30, 2009

Before starting at New Utrecht, B.P. was a student at FDR High School ("FDR"). Pl.'s Rule 56.1 Counterstatement of Material Facts ("Pl.'s 56.1 Counter.")[1] ¶ 2, ECF No. 55. On March 1, 2007, B.P. ran from FDR security staff and struck Steven DeMarco, the Assistant Principal, in the face. *Id.;* DeMarco Statement, Laskin Decl. Ex. 6. As a result, B.P. received a superintendent's suspen-

sion and was transferred to New Utrecht. Pl.'s 56.1 Counter. ¶¶ 2, 5.

As a New Utrecht student, B.P. had a reputation for cutting class and hanging out in the hallways. Def.'s 56.1 ¶ 6. In March 2008, two incident reports were filed regarding B.P. March 2008 Incident Take in Sheets, Laskin Decl. Ex. 8. The reports address two separate occasions where school personnel found B.P. in the auditorium while cutting class. *Id.* One of the reports also stated that B.P. was found trying to break a chair in the auditorium. *Id.* at 2. Both reports note that B.P. chronically cuts class and wanders the halls. *Id.*

The following school year, in September 2008, Barry Nagel, the band director at New Utrecht, wrote an incident report letter to the deans. Sept. 29, 2008 Nagel Letter, Laskin Decl. Ex. 14. According to the letter, B.P. appeared in Nagel's sixth period class and gave him "three hard taps/pokes" on his "shoulder/back area." *Id.* When Nagel told B.P. that "[y]ou don't just go and touch people[,]" B.P. responded "[w]hat?! I got this class!" *Id.* Nagel looked at B.P.'s program and noticed that B.P. did not have sixth period in that classroom. *Id.* Nagel reported that B.P. made him feel threatened and invaded his personal space. *Id.*

Shortly thereafter, on October 10, 2008, Christopher Knight, B.P.'s Spanish teacher, wrote a report regarding an incident with B.P. in his class that day. October 10, 2008 Knight Report, Decl. of Lesley Berson Mbaye ("Mbaye Decl.") Ex. J, ECF No. 53. B.P. arrived late to class and demanded all of the homework he had recently missed; a heated exchange be-

---

1. Plaintiff submits a Rule 56.1 Statement of Disputed Facts and Counterstatement of Material Facts, ECF No. 55, which contains two separate sections. The first section is "Plaintiff's Response to Defendants' Statement of Undisputed Facts" and the second section is "Plaintiff's Counterstatement of Undisputed Facts." Because the paragraphs in these sections are independently numbered, I cite to these sections as if they were separate documents.

tween B.P. and Knight followed. *Id.* Knight then asked B.P. to step outside and B.P. refused, stating that he was going to blow up the class and the school. *Id.* B.P. further stated "I'm going to bomb him, I'm going to bomb her … no, not her, she's cute." *Id.* Knight asked a student to go to the dean's office and, at the same time, B.P. walked out of class. *Id.* Knight attempted to contact B.P.'s family and explained in this report that B.P. "only causes disturbances, has little to zero control over his emotions and actions, and I feel could pose a possible danger to other students … I am not comfortable with him in the classroom, and I believe that a physical altercation is possible." *Id.*

Also in this report, Knight noted that B.P. had recently been transferred into his Spanish class but had only attended three times. *Id.* Each time B.P. was in class, "he caused a disturbance to the class and has harassed certain female students in ways that are inappropriate, as well as discussing his 'virility' with women." *Id.* Although this report does not identify a specific incident of harassment, Knight later stated in his deposition that "there was one female that [B.P.] was always either talking to or trying to touch[,]" and that B.P. "had a propensity for trying to sit behind this girl and brush the back of her neck and play with her hair." Christopher Knight Dep. March 3, 2011 ("Knight Dep.") 10:13–18. Knight would "ask [B.P.] to stop and move his seat away from the females[,] [b]ut even when [he] would move him to a different spot [B.P.] would still try to blow kisses, and make noises at the females … this was his behavior." *Id.* at 10:19–23.

In response to B.P.'s bomb threats, B.P. received, on October 10, 2008, a principal's suspension from October 14, 2008 through October 21, 2008. Oct. 14, 2008 Principal's Suspension Notification, Matone Decl. Ex. C. Matone contacted B.P.'s father and

scheduled a guidance conference with B.P. and one of his parents. *Id.*

Shortly after B.P.'s suspension, on October 28, 2008, Knight reported another incident involving B.P. Knight Statement by Staff Member, Laskin Decl. Ex. 11. On this date, B.P. arrived late, cursed at Knight, called him a snitch, and told him to "suck his dick." *Id.* At the peak of their encounter, Knight left the classroom and asked Catherine Verga, a fellow teacher, to watch his class. *Id.* Verga also filed a statement regarding the incident with B.P. Verga Statement by Staff Member, Laskin Decl. Ex. 12. According to both reports, Verga called security and radioed Matone. *Id.* When Verga asked B.P. to come with her, he refused to leave the room and shouted obscenities. *Id.* Eventually, B.P. left the room with a school official, whose role at New Utrecht is not identified in the record. *Id.*

On November 13, 2008, Knight wrote a letter to B.P.'s guidance counselor, Andrea Belisario, updating her on B.P.'s progress. Nov. 13, 2008 Knight Letter, Laskin Decl. Ex. 13. The letter does not address any specific incident, but describes B.P.'s unmotivated academic performance and his continued disturbances in class. *Id.*

Also on November 13, 2008, B.P. was issued another principal's suspension from November 14, 2008 through November 21, 2008 for "engaging in vandalism, graffiti, or other intentional damage to school property." Nov. 13, 2008 Suspension Notification, Matone Decl. Ex. D. Matone scheduled another guidance conference with B.P. and one of his parents. *Id.*

Almost four months later, B.P. was issued another principal's suspension from March 23, 2009 through March 27, 2009 for "refusing to give up [an] electronic device, insubordination, interrupting teacher during class, [and] interrupting students['] progress of learning." March 20, 2009

Principal's Suspension Notification, Matone Decl. Ex. E. Again, Matone scheduled a guidance conference with B.P. and one of his parents. *Id.*

### 3. April 30, 2009

At approximately 11:00 a.m. on April 30, 2009, two female students went to Matone's office and reported separate incidents involving B.P. Matone Decl. ¶ 12; Def.'s 56.1 ¶ 10. Each girl reported that B.P. pulled their hair toward his genitals and told them to "suck his dick." Def.'s 56.1 ¶ 10; Occurrence Report, Matone Decl. Ex. A. The first incident occurred on April 10, 2009, but the student was afraid to report the incident at that time. Occurrence Report at 1. The second incident occurred on April 29, 2009. *Id.*

In response to these allegations, Matone asked the girls to prepare written statements regarding their encounters with B.P. Def.'s 56.1 ¶ 13; Matone Decl. ¶ 12. Matone contacted the girls' parents and called B.P.'s father to notify him of the allegations. Occurrence Report at 1. Matone also filled out an Occurrence Report, which is a disciplinary action form entered into a DOE-wide database. Matone Decl. ¶ 8.

Also on the morning of April 30, 2009, M.H. arrived late to school because she did not have first or second period. M.H. Dep. Sept. 28, 2010 ("2010 M.H. Dep.") 51:19–23, 60:11–14, Mbaye Decl. Ex. F. As she was walking up the stairs, M.H. found herself alone in the stairwell with B.P. Def.'s 56.1 ¶ 15. B.P. grabbed M.H. by the arm and pressed her against the wall with all of his weight. *Id.* ¶ 17; 2010 M.H. Dep. 58:9–10. M.H. was trying to push B.P. off of her and told him to "get off." 2010 M.H. Dep. 58:9–12. B.P. was trying to kiss her on the mouth, but M.H. kept moving. *Id.* at 58:13–14. B.P. touched M.H. all over, including her legs, stomach, and breasts, and bit her on the neck. *Id.*

at 58:13–18; M.H. Dep. Aug. 27, 2009 ("2009 M.H. Dep.") 31:19–32:8, Laskin Decl. Ex. 5. B.P. did not touch M.H. underneath her clothing. 2010 M.H. Dep. 60:3–4. B.P. tried to rub against M.H. but did not succeed because M.H. was pushing him away. *Id.* 60:1–2. Eventually, B.P. let go of M.H. and ran off down the stairs. *Id.* at 60:22–24.

Prior to this encounter, M.H. and B.P. had sat next to each other in class on several occasions without incident, and M.H. had never heard of B.P. engaging in physical sexual harassment. 2010 M.H. Dep. 77:3–8; Def.'s 56.1 ¶ 16.

After B.P. ran away, M.H. stood in the stairwell for a few minutes because she did not know what to do. Pl.'s Rule 56.1 Response to Def.'s Statement of Undisputed Facts ("Pl.'s 56.1") ¶ 21, ECF No. 55; 2010 M.H. Dep. 61:2–9. M.H. then went to her English class, which was still in session. 2010 M.H. Dep. 61:7–13. After M.H. arrived in class, one of her friends noticed something on M.H.'s neck. *Id.* M.H. went to the bathroom and saw a mark with red dots on her neck. *Id.* at 63:8–10. From the bathroom, M.H. called her mother, plaintiff, and told her that something happened and that she would call her back. *Id.* at 63:11–15. M.H. then went back to class, and after the end of the period, she left school and called plaintiff again. *Id.* The two made a plan, and M.H. took the train two stops away from school, where plaintiff picked her up. *Id.* at 64:13–17. After hearing M.H.'s story, plaintiff drove M.H. back to school to report the incident. Def.'s 56.1 ¶ 24.

At approximately 12:00 p.m. on April 30, 2009, M.H. and plaintiff arrived in Matone's office, where the other female students were still writing out their statements. *Id.* at ¶ 25. M.H. informed Matone of the incident involving B.P. Matone Decl. ¶ 14. Matone asked M.H. to pre-

pare a written statement regarding the incident. Def.'s 56.1 ¶ 26. Matone then put out an "APB" radio call for school security to find B.P. and notified the New York City Police Department of the incident. *Id.* ¶ 27. While M.H. was still in Matone's office, the police arrived and informed Matone that B.P. was in custody. Def.'s 56.1 ¶ 27; 2010 M.H. Dep. 68:24–69:5.

Immediately after learning that B.P. was in police custody, Matone requested that B.P. be placed on a superintendent's suspension. Def.'s 56.1 ¶ 28. The DOE's Office of School and Youth Development granted Matone's request the same day, and B.P.'s suspension took effect the following day, May 1, 2009. *Id.;* April 30, 2009 DOE General Education Suspension Notice, Matone Decl. Ex. B.

### 4. Aftermath of the April 30, 2009 Incident

Beginning May 1, 2009, B.P. was not allowed inside New Utrecht until his suspension hearing was held and the length of his suspension was determined. Def.'s 56.1 ¶ 29. At his May 14, 2009 suspension hearing, B.P. pled no contest.[2] *Id.* ¶¶ 30–31. New Utrecht recommended a one calendar year suspension without review, which is the maximum suspension allowed under the DOE's Chancellor's Regulations and Disciplinary Code, and the hearing

officer adopted this recommendation. *Id.* ¶ 32. Accordingly, B.P. was suspended from New Utrecht for the remainder of the 2008–2009 school year and through April 30, 2010. Matone Decl. ¶ 18. B.P. has not attended New Utrecht since this suspension. Def.'s 56.1 ¶ 33; Matone Decl. ¶ 20.

M.H. continued at New Utrecht and failed three classes during the spring semester of 2009: English, Algebra, and Living Environment. 2010 M.H. Dep. 96:11–14. In Algebra, M.H. failed three tests, two of which were before the incident with B.P. *Id.* at 100:6–21; Def.'s 56.1 ¶ 35. M.H. did not study for any of the three tests. 2010 M.H. Dep. 100:6–21.

Additionally, in the fall semester of 2009, M.H. failed both English and Spanish. *Id.* at 116:8–117:19; Def.'s 56.1 ¶ 37. M.H. testified that she never did the coursework for her English class because the incident with B.P. was always bothering her. 2010 M.H. Dep. 116:12–117:1. M.H. also testified that she never went to Spanish class because seeing the female teacher reminded her of what happened with B.P. *Id.* at 117:12–118:4. M.H.'s high school transcript reflects these failing grades, but also reflects similar scores prior to the incident with B.P.[3] DOE Student Transcript, Decl. of M.H. ("M.H. Decl.") Ex. 2 at 6–7, ECF No. 57.

---

2. Plaintiff does not dispute that B.P.'s suspension hearing took place on May 14, 2009. Def.'s 56.1 ¶ 33; Pl.'s 56.1 ¶ 30. However, the DOE suspension notice lists the suspension hearing date as May 7, 2009. Matone

Decl. Ex. B. The discrepancy is immaterial given the undisputed fact that B.P. was not allowed into New Utrecht High School before his hearing was held and a suspension was determined. Def.'s 56.1 ¶ 29.

3.

| | Term 1 2008 | Term 2 2008 | Term 1 2009 | Term 2 2009 |
|---|---|---|---|---|
| **English** | 56 | 55 | 55 | 65 |
| **Spanish** | 77 | 65 | 55 | 79 |
| **Global** | 70 | 75 | 34 | 55 |
| **Algebra** | 50 | 55 | 65 | 75 |

DOE Student Transcript, M.H. Decl. Ex. 2 at 6–7 (reflecting scores out of a possible 100).

In the fall of 2009, after filing this lawsuit, M.H. received numerous "dirty looks" from Matone. M.H. Decl. ¶ 6. Additionally, during that time, Matone confronted M.H.'s friend Michael and "ordered him to write a statement in which he admitted being [M.H.'s] boyfriend which he was not." *Id.* ¶ 7. M.H. filed a witness statement report with New Utrecht, which outlined these events and noted that Michael did not provide the written statement Matone requested. March 3, 2010 M.H. Statement, Laskin Decl. Ex. 18.

After M.H.'s junior year, she transferred to West Brooklyn Community High School. M.H. Decl. ¶ 9. Since beginning her senior year at this new school, M.H. has improved her grades and attendance. M.H. Decl. ¶ 9; DOE Student Transcript, M.H. Decl. Ex. 2 at 6–7.

Following her incident with B.P., M.H. has been treated by mental health professionals and has been diagnosed with Post–Traumatic Stress Disorder ("PTSD"). M.H. Decl. ¶ 3. In addition to the diagnosis of PTSD, M.H. has also been diagnosed with a growth delay, Fetal Alcohol Syndrome (traits only), and a lisp. June 8, 2010 Evaluation Mental Health & Chemical Dependency, M.H. Decl. Ex. 1 at 2. M.H. suffers from nightmares and flashbacks of the incident with B.P. 2010 M.H. Dep. 78:2–25; M.H. Decl. ¶ 3.

### DISCUSSION

#### A. Summary Judgment Standard

The moving party is entitled to summary judgment as a matter of law if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a), (c). Summary judgment is appropriate only if "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, "the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

The movant bears the burden of demonstrating that "no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (internal quotation marks omitted) (emphasis in original) (citing Fed. R.Civ.P. 56(c)). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *See Shannon v. New York City Transit Auth.,* 332 F.3d 95, 99 (2d Cir.2003) (citing *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998)).

#### B. Title IX Claims Against Matone and the City

 Before reaching the substance of defendants' motion for summary judgment, I note that neither Matone nor the City can be liable under Title IX. Courts have consistently held that only institutional recipients of federal funds can be held liable under Title IX, and, therefore, individuals like Matone, who are not recipients, cannot be held liable. *Folkes v. New York Coll. of Osteopathic Med. of New York Inst. of Tech.,* 214 F.Supp.2d 273, 282 (E.D.N.Y. 2002) (citations omitted); *Bliss v. Putnam Valley Cent. Sch. Dist.,* No. 06–CV–15509, 2011 WL 1079944, at *5 (S.D.N.Y. Mar. 24, 2011). Additionally, because the City is a

separate legal entity from the DOE, the City "cannot be liable for the acts of the [DOE] or its employees." *Romero v. City of New York*, 839 F.Supp.2d 588, 601 (E.D.N.Y.2012) (citing *Chapman v. City of New York*, No. 06–CV–3153, 2011 WL 1240001, at *5 (E.D.N.Y. Mar. 25, 2011)).

In her opposition to defendants' motion, plaintiff concedes that Matone and the City cannot be liable under Title IX for claims of sexual harassment or retaliation. Accordingly, I recommend the Court grant summary judgment as to plaintiff's sexual harassment and retaliation claims under Title IX against Matone and the City.

## C. Title IX Sexual Harassment Claim Against DOE

 Title IX provides, with certain exceptions not applicable here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681(a). A school board receiving federal funding can be liable under Title IX for student-on-student sexual harassment.[4] *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). To establish such a claim, a plaintiff must demonstrate that: (1) the school authorities had actual knowledge of the harassment; (2) they were deliberately indifferent to the harassment; and (3) the harassment was "so severe, pervasive, and objectively offensive" that it deprived plaintiff of "access to the educational opportunities or benefits provided by the school." *Id.* at 650, 119 S.Ct. 1661. I will discuss each element in turn.

### a. Actual Knowledge

 For an educational institution to be liable under Title IX, the plaintiff must establish that a school official with authority to address the alleged discrimination had actual knowledge, as opposed to mere constructive knowledge, of the discrimination. *Hayut v. State Univ. of New York*, 352 F.3d 733, 750 (2d Cir.2003) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)); *Bliss*, 2011 WL 1079944, at *5. As a result, this requirement imposes a significant evidentiary burden on a Title IX claimant. *Hayut*, 352 F.3d at 750.

 The analysis of actual knowledge is often "inextricably intertwined" with the analysis of deliberate indifference. *See Zamora v. N. Salem Cent. Sch. Dist.*, 414 F.Supp.2d 418, 424 (S.D.N.Y.2006) (citing *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 141 (2d Cir.1999)). In the context of deliberate indifference, the actual notice standard may be satisfied by knowledge of a "substantial risk of serious harm" where there have been multiple prior allegations of the same or similar conduct that is at issue. *Id.* at 424; *see Johnson v. Galen Health Institutes, Inc.*, 267 F.Supp.2d 679, 688 (W.D.Ky.2003) ("[A]ctual notice standard is met when an appropriate official has actual knowledge of a substantial risk of abuse to students based on prior complaints by other students."). Further, in this District, courts require that a school official "possessed enough knowledge of the harassment that [he] reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Folkes*, 214 F.Supp.2d at 285 (quoting *Crandell v. New York Coll. of Osteopathic*

---

4. Defendants do not contest that the DOE is a recipient of federal education funding that could be held liable under Title IX.

*Med.,* 87 F.Supp.2d 304, 320 (S.D.N.Y. 2000)).

Plaintiff has not met this significant burden. Neither B.P.'s past problematic behavior nor the reports by two other female students concerning B.P.'s harassment provided actual notice to DOE that B.P. would sexually abuse a female student.

### i. B.P.'s Past Behavior

In *Gebser v. Lago Vista Independent School District,* the Supreme Court found that complaints of a teacher's sexually inappropriate comments in class were "plainly insufficient" to alert the school district or administrators that the teacher was involved in a sexual relationship with a student. 524 U.S. at 291, 118 S.Ct. 1989. Relying on *Gebser,* courts have found that "the conduct that allegedly put the administration on notice and the conduct ultimately at issue in the litigation must be sufficiently similar to find liability." *Bliss,* 2011 WL 1079944, at *6 (citations omitted); *see, e.g., Tyrrell v. Seaford Union Free Sch. Dist.,* 792 F.Supp.2d 601, 625 (E.D.N.Y.2011) (finding school district lacked actual notice where record was "bereft" of any evidence that district knew of "similar harassment towards other students thereby indicating some degree of risk that plaintiff would be subjected to similar conduct"); *Doe v. Flaherty,* 623 F.3d 577, 585 (8th Cir.2010) (holding that inappropriate text messages did not put school on actual notice of sexual abuse); *Escue v. N. Oklahoma Coll.,* 450 F.3d 1146, 1154 (10th Cir.2006) (holding that professor's dating two non-traditional students, single incident of inappropriate touching, and series of inappropriate name-calling incidents did not provide administration with actual knowledge that professor posed substantial risk of sexual harassment to students); *cf. Zamora,* 414 F.Supp.2d at 421–22, 425 (finding past reports that teacher fondled other students' breasts and touched another girl inappro-

priately over ten year period could lead reasonable juror to find school district had actual knowledge of substantial risk of sexual abuse).

■ Here, B.P.'s past inappropriate and insubordinate behavior, although extensive, is not sufficiently similar to the harassment at issue in this litigation and, therefore, cannot have provided actual notice to DOE. *See J.B. v. Mead Sch. Dist.,* No. 08–CV–223, 2010 WL 5173164, at *2, *5 (E.D.Wash. Dec. 10, 2010) (finding students' disciplinary history of defiance, cutting class, argumentative behavior, lack of cooperation, and use of profanity insufficient to put school on notice of significant risk that they might sexually abuse another student). Further, prior to April 30, 2009, the record is "bereft" of any specific incidents of physical, sexual abuse by B.P. against other students similar to the kind M.H. suffered. *See Tyrrell,* 792 F.Supp.2d at 625.

Plaintiff argues that "Mr. Knight's reports of sexual harassment and improper touching" provided notice to DOE. Pl.'s Mem. at 3. Defendant DOE argues, and I agree, that plaintiff mischaracterizes these reports of B.P.'s past conduct and that, in fact, the conduct in these reports was not sufficiently similar to put the DOE on notice that B.P. would sexually abuse M.H. Def.'s Reply Mem. in Supp. Mot. Summ. J. ("Def.'s Reply") at 1–3. Although Knight's October 10, 2008 report mentions that B.P. "has harassed certain female students in ways that are inappropriate, as well as discussing his 'virility' with women[,]" this statement does not indicate whether the prior harassment was physical or sexual in nature and, therefore, does not provide actual knowledge of behavior "the kind in which plaintiff's legal claim is based." *See Johnson,* 267 F.Supp.2d at 689 (finding notice of instructor's tendency to create sexually offensive environment not suffi-

cient to provide notice that instructor would sexually proposition student).

Additionally, Knight recalled in his 2011 deposition, and not in a previous report, that B.P. kept "trying to sit behind this girl and brush the back of her neck and play with her hair" and that when Knight moved B.P. to a different spot, "he would still try to blow kisses, make noises at the females." Knight Dep. 10:9–23. Even if Knight had notified the school administration of this minimal touching and verbal conduct prior to April 30, 2009, it would not have provided actual notice that B.P. posed a substantial risk of sexual abuse to other students. *See Davis v. DeKalb Cnty. Sch. Dist.*, 233 F.3d 1367, 1372–73 (11th Cir.2000) (finding student's complaint that teacher "touched her behind" during gym class and later tried to touch her again at the water fountain insufficient to alert district that teacher was sexually abusing students). The conduct Knight describes involves B.P.'s minimal physical contact with a female student's hair and neck, and verbal conduct that could be plausibly construed as either harassment or mere obnoxious teenage behavior. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ("Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults.").

Finally, plaintiff points to B.P.'s transfer to New Utrecht after elbowing a teacher at his former school and Nagel's report that B.P. repeatedly tapped him three times on the shoulder and back area. Pl.'s Mem. at 4–5. Again, this behavior is insufficiently similar to sexually abusing a fellow student, which is the conduct at issue here. B.P.'s physical contact with teachers, combined with his constant insubordination, would, at most, provide notice that B.P. could pose a risk of causing a physical altercation with a teacher, not of sexually abusing a fellow student. *See Johnson*, 267 F.Supp.2d at 689 (finding *Gebser* requires a stringent correlation between discrimination complained of and type of notice to defendant).

Accordingly, nothing in the record reveals that B.P.'s past insubordinate and inappropriate conduct could have provided actual knowledge to defendant DOE that he posed a risk of sexually abusing other students.

### ii. Reports of Harassment By Two Other Female Students on April 30, 2009

■ Defendant DOE argues, and I agree, that the earlier reports by two other female students were too close in time to M.H.'s abuse to have provided DOE with actual notice. Def.'s Mem. at 10. M.H. reported her incident with B.P. only one hour after the two other female students reported their incidents of sexual harassment by B.P. Further, in the time between M.H.'s incident and her report, M.H. finished her class period, took the train to meet her mother, and drove back to school. Given this timing, M.H. was likely abused around the same time as, or shortly after, the other female students made their reports to Matone. Although these reports involved similar conduct to the abuse suffered by M.H., DOE did not have prior notice or a reasonable amount of time to respond with remedial measures.

In the absence of actual knowledge of prior similar conduct by B.P., defendant DOE cannot be liable under Title IX for B.P.'s sexual abuse of M.H.

### b. Deliberate Indifference

■ A defendant will only be deemed "deliberately indifferent" to known acts of student-on-student harassment where its "response to the harassment or

lack thereof is clearly unreasonable in light of the known circumstances," *Davis*, 526 U.S. at 648, 119 S.Ct. 1661, or "when remedial action only follows after a lengthy and unjustified delay." *Hayut*, 352 F.3d at 751 (internal quotations and citation omitted). A defendant, therefore, is only required to "respond to known peer harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649, 119 S.Ct. 1661.

■ To show that a defendant was deliberately indifferent, a plaintiff must provide "something more than a proffer indicating the ultimate inadequacy of preventative and curative measures." *K.F. ex rel. C.F. v. Monroe Woodbury Cent. Sch. Dist.*, No. 12–CV–2200, 2013 WL 177911, at *6 (S.D.N.Y. Jan. 16, 2013) (motion to dismiss Title IX claim for peer-on-peer sexual harassment) (quoting *Yap v. Oceanside Union Free Sch. Dist.*, 303 F.Supp.2d 284, 295 (E.D.N.Y.2004)). Rather, "the measures taken must be so inadequate that a degree of discriminatory intent may be inferred." *Id.* "In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649, 119 S.Ct. 1661; *see also D.T. v. Somers Central Sch. Dist.*, 348 Fed.Appx. 697, 700 (2d Cir. 2009).

Here, DOE consistently took appropriate disciplinary measures in response to B.P.'s problematic conduct at New Utrecht. Defendant DOE also took prompt and effective measures in response to M.H.'s April 30, 2009 report. Accordingly, DOE's responses were not clearly unreasonable as a matter of law.

*i. DOE's Responses to B.P.'s Conduct Prior to April 30, 2009*

■ Plaintiff argues that defendant DOE failed to take any preventative or curative measures after receiving Knight's and Nagel's reports. Pl.'s Mem. at 6. In response to Knight's report, defendant did not address B.P.'s "harassment of certain female girls in ways that are inappropriate" but instead suspended B.P. for making bomb threats. There is no evidence in the record that DOE responded to Nagel's report that B.P. tapped him three times on the back and shoulder area. However, these reports describe acts that were not "known acts of peer sexual harassment," which is the only conduct for which the DOE can be liable. *Davis*, 526 U.S. at 648, 119 S.Ct. 1661; *see also K.F. ex rel. C.F.*, 2013 WL 177911, at *7 ("[Defendant]'s obligation was to respond to a *Title IX violation* in a manner that was not clearly unreasonable.") (emphasis added).

Clearly, here, the analysis of actual knowledge and the analysis of deliberate indifference are "inextricably intertwined." *Zamora*, 414 F.Supp.2d at 424. If the Knight or Nagel reports, or any of B.P.'s past conduct, had put DOE on actual notice that B.P. posed a threat of sexual abuse, only then would there be a question of whether DOE's disciplinary action, or lack thereof, made M.H. vulnerable to B.P.'s assault. *M. v. Stamford Bd. of Educ.*, No. 3:05–CV–0177, 2008 WL 2704704, at *10 (D.Conn. July 7, 2008) (finding only school board's lack of disciplinary action *after notice of requisite specificity* could permit jury to find board made student more vulnerable to harassment), *vacated in part on other grounds*, 2008 WL 4197047 (D.Conn. Sept. 9, 2008); *Kelly v. Yale Univ.*, No. 3:01–CV–1591, 2003 WL 1563424, at *4 (D.Conn. Mar. 26, 2003) (finding where university had no notice of rapist's harassing behavior prior to assaulting fellow student, university could not be liable for assault).

■ Additionally, I note that even if B.P.'s conduct did provide actual notice,

DOE was not required to "purge" New Utrecht of peer harassment, engage in any particular disciplinary action, or expel B.P. *Davis,* 526 U.S. at 648, 119 S.Ct. 1661; *see also K.F. ex rel C.F.,* 2013 WL 177911, at *8. Defendant's disciplinary measures over time, which focused on B.P.'s bomb threats and disruptive behavior, complied with the DOE Disciplinary Code[5] and reflected a school district's ability to use discretion in disciplining its students. *See Davis,* 526 U.S. at 648, 119 S.Ct. 1661 (giving schools "flexibility" in their disciplinary decisions and directing courts to "refrain from second-guessing the disciplinary decisions made by school administrators") (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 342–43, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)).

In sum, plaintiff has failed to show that DOE's responses to B.P.'s past problematic conduct were so inadequate that a reasonable juror could infer a degree of discriminatory intent on DOE's part. *See K.F. ex rel C.F.,* 2013 WL 177911, at *6. DOE's responses to B.P. were not clearly unreasonable as a matter of law.

### ii. *DOE's Response to M.H.'s Report of Abuse*

■■■ DOE's response to M.H.'s report, and the reports of the two other female students, was expeditious and effective. Upon learning of the three separate incidents involving B.P., which were all reported to Matone within a one hour time span, Matone called the parents of the other female students; called B.P.'s parents; asked each student, including M.H., to prepare a written statement; located B.P.; contacted police; and immediately

initiated disciplinary action against B.P. by requesting a superintendent's suspension. This response, which resulted in B.P.'s one-year suspension and prevented any further abuse by B.P. against M.H., was not clearly unreasonable. *See Soriano v. Bd. of Educ. of City of New York,* No. 01–CV–4961, 2004 WL 2397610, at *4–5 (E.D.N.Y. Oct. 27, 2004) (holding defendant not deliberately indifferent where defendant asked victim to prepare a written statement, notified parents of harassing students, suspended two of harassing students for five days, and transferred student who inappropriately touched victim to different classroom); *Preusser v. Taconic Hills Cent. Sch. Dist.,* No. 10–CV–1347, 2013 WL 209470, at *7 (N.D.N.Y. Jan. 17, 2013) ("Courts may consider whether the disciplinary action had a positive outcome, i.e., the victim suffered no subsequent harassment, in determining whether the remedies were reasonable.").

As a matter of law, DOE's response to both B.P.'s earlier problematic behavior and M.H.'s report of sexual abuse was not clearly unreasonable. Accordingly, plaintiff cannot establish a Title IX claim against DOE.

### c. *Sufficiently Severe, Pervasive, and Objectively Offensive As To Deprive Access to Educational Benefits*

■■■ The final prong of Title IX liability requires plaintiff to show that the harassment was "so severe, pervasive, and objectively offensive that it can be said to

---

5. According to the DOE's Disciplinary Code, the infractions of cutting class, failing to be in one's assigned place on school premises, and engaging in verbally rude or disrespectful behavior invoke a range disciplinary responses or guidance interventions that include the following: parent outreach, intervention by counseling staff, guidance conferences, reprimand by appropriate supervisor, parent con-

ference, or in-school disciplinary action. Disciplinary Code at 18. Further, the infractions of persistent insubordinate behavior, engaging in vandalism, graffiti, or other intentional damage to school property, and bomb threats can all be addressed with a principal's suspension under the Disciplinary Code. *Id.* at 20, 22.

deprive the victims of access to educational opportunities or benefits provided by the school." *Davis,* 526 U.S. at 650, 119 S.Ct. 1661. To meet this requirement, the harassment must have been "serious enough to have [had] a systemic effect of denying the victim equal access to an educational program or activity," *id.* at 652, 119 S.Ct. 1661, and "more than episodic; it must [have been] sufficiently continuous and concerted." *Hayut,* 352 F.3d at 745 (citation omitted).

Here, the single incident of sexual abuse that M.H. suffered, although unfortunate, was not so severe, pervasive, or objectively offensive that it deprived her of access to educational opportunities at New Utrecht.

### i. M.H.'s Abuse Was Not "Sufficiently Severe"

In *Davis,* the Supreme Court noted that it was unlikely that Congress, in establishing Title IX, would have thought a single instance of one-on-one peer harassment sufficient to rise to the level of denying a victim equal access to an educational program. 526 U.S. at 652, 119 S.Ct. 1661. However, in a narrow realm of cases, courts have found "sufficiently severe" harassment under Title IX from a single incident, but only were the conduct consists of extreme sexual assault or rape. *See, e.g., Bliss,* 2011 WL 1079944, at *1, 5 (holding single incident where male social studies teacher drugged and raped female student "sufficiently severe" under Title IX); *Stamford Bd. of Educ.,* 2008 WL 2704704, at *9 (finding single incident of rape by male student of a female special education "sufficiently severe" harassment under Title IX), *vacated in part on other grounds,* 2008 WL 4197047; *Kelly,* 2003 WL 1563424, at *3 (holding single incident of rape by male student was "sufficiently severe").

M.H.'s abuse was far less extreme than the conduct at issue in those single incident cases. M.H. was not raped, nor did she experience a "serious" sexual assault. The extent of her abuse consisted of B.P. putting all of his weight on her, touching her breasts, stomach and legs over her clothing, and biting her neck hard enough to leave a mark. Undoubtedly, this behavior is inappropriate and should not to be condoned; however, this conduct does not arise to the level of "sufficiently severe, pervasive, and objectively offensive" as a matter of law. *See, e.g., Brodsky ex rel. S.B. v. Trumbull Bd. of Educ.,* No. 06–CV–1947, 2009 WL 230708, at *6 (D.Conn. Jan. 30, 2009) (holding one incident of male student touching a female student's breasts and buttocks, and other incidents of name-calling, insults, and physical harassment "not sufficiently pervasive or severe from an objective standpoint"); *Soriano,* 2004 WL 2397610, at *6 (finding two separate incidents with two male students, where one boy touched female student's vagina through her skirt and other boy slapped her buttocks, not sufficiently pervasive under Title IX).

### ii. M.H. Was Not Deprived of Access to Educational Opportunities

 For a court to find that harassment denied a student access to educational resources and opportunities, the "harassment must have [had] a concrete negative effect on the victim's education, which may include dropping grades, becoming homebound or hospitalized due to harassment, physical violence, or physical exclusion from a school resource." *Preusser,* 2013 WL 209470, at *8 (internal citations and quotation marks omitted); *see Davis,* 526 U.S. at 654, 119 S.Ct. 1661.

Here, M.H. has been diagnosed with PTSD and suffers from flashbacks and nightmares, which plaintiff argues led to a decline in her academic performance. However, a review of M.H.'s English, Spanish, Algebra, and Global grades during her 2008 and 2009 terms reveals con-

sistent subpar grades and no significant decline in performance. *See* DOE Student Transcript, M.H. Decl. Ex. 2 at 6–7. In fact, M.H.'s Algebra grades gradually improve over time. *Id.*

In the absence of declining grades and other evidence of a "concrete negative effect" on M.H.'s education, no reasonable juror could conclude that the single incident of abuse deprived M.H. of educational benefits to establish a claim under Title IX. *Soriano*, 2004 WL 2397610, at *6 (finding victim, who was afraid to go out and play, had nightmares and declining grades, and attended therapy, was not denied access to school resources even though her parents removed her from school after assault).

 In her declaration, M.H. states that she was "embarrassed" about the incident, "fearful it would happen again," and experienced teasing and name-calling by other students after the incident. M.H. Decl. ¶¶ 4–5. With B.P. permanently removed from New Utrecht, M.H.'s fear of future abuse alone could not have provided a sufficiently hostile environment to deprive her of access to educational opportunities. *Contra Kelly*, 2003 WL 1563424, at *3 (holding rapist's continued presence on campus exposed victim to future encounters, which "of any sort ... could create an environment sufficiently hostile to deprive victim access to opportunities of university"). Moreover, "simple acts of teasing and name-calling among school children" alone cannot support a claim for damages under Title IX. *Davis*, 526 U.S. at 652, 119 S.Ct. 1661; *Tyrrell*, 792 F.Supp.2d at 629 (finding further teasing and name-calling by fellow students after assault insufficient as a matter of law to establish Title IX claim).

In sum, plaintiff has failed to create a genuine issue of fact as to whether (1) DOE had actual notice that B.P. posed a risk of sexually abusing another student;

(2) DOE's response to either B.P.'s past conduct or M.H.'s report was clearly unreasonable in light of the known circumstances; and (3) the sexual abuse M.H. suffered was so severe as to effectively deny her equal access to New Utrecht's resources and opportunities. Accordingly, I respectfully recommend the Court grant DOE's motion for summary judgment with respect to plaintiff's sexual harassment claim under Title IX.

## D. Title IX Retaliation Claim Against DOE

 Plaintiff's brief focuses solely on the Title IX sexual harassment claim against DOE, and fails to address the Title IX retaliation claim against DOE, despite having asserted the latter claim against all defendants in her amended complaint. Amend. Compl. ¶ 18, ECF No. 13.

 Although plaintiff does not pursue her retaliation claim against DOE, I note that even if she did, her claim would fail as a matter of law. A plaintiff claiming retaliation for a complaint of sex harassment under Title IX must show: (1) protected activity by plaintiff; (2) knowledge by defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir.2011) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998)). Further, to establish a prima facie case of retaliation, "a plaintiff must show that a reasonable person would have found the challenged action materially adverse, which means it well might have dissuaded a reasonable person from making or supporting a complaint." *Williams v. Columbia Univ.*, No. 11–CV–8621, 2012 WL 3879895, at *3 (S.D.N.Y. Aug. 28, 2012) (citing *Burlington N. & Santa Fe Ry. Co. v. White*,

548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (Title VII retaliation)) (internal citations and quotation marks omitted); *see also Papelino,* 633 F.3d at 91 (explaining that the requirements for establishing a prima facie case of retaliation are the same under Title VII and Title IX).

Here, plaintiff has not established that defendants took any materially adverse action against M.H. Plaintiff alleges merely that Matone asked M.H.'s friend Michael to sign a statement that he was dating M.H. in order to "smear her character and create a false impression that [M.H.] was somehow at fault for B.P.'s attack." Pl.'s Mem. at 5. Not only is there no "action" here because Michael did not sign the statement, the record contains no evidence to show that this interaction had any adverse or negative effect on M.H., her education, or her lawsuit. *See Fincher v. Depository Trust and Clearing Corp.,* 604 F.3d 712, 721 (2d Cir.2010) ("The antiretaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'") (citing *Burlington N.,* 548 U.S. at 67, 126 S.Ct. 2405). Plaintiff has not shown that Matone's interaction with Michael would dissuade a reasonable person in her situation from filing a lawsuit. Therefore, I respectfully recommend the Court grant defendants' motion for summary judgment on plaintiff's Title IX retaliation claim under Title IX against DOE.

### E. State Law Claims

Plaintiff's amended complaint also alleges two New York State law claims against all defendants: negligent infliction of emotional distress and negligent supervision. In opposing defendants' motion, plaintiff does not pursue any state law claims against the City or Matone. Indeed, plaintiff cannot have any viable state law claims against the City because it is a separate legal entity from the DOE. *Romero,* 839

F.Supp.2d at 601 (citing *Chapman,* 2011 WL 1240001, at *5). I note, however, that the authority which precludes plaintiff's claim against Matone under Title IX, does not apply to plaintiff's state law claims. *Folkes,* 214 F.Supp.2d at 282 (holding only institutional recipients of federal funds, not individuals, can be held liable under Title IX). Despite plaintiff's failure to address these claims against Matone, I will adhere to the amended complaint and treat these state law claims as against both DOE and Matone.

#### a. Supplemental Jurisdiction

In cases where district courts have original jurisdiction, the courts also have jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case of controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Although Section 1367(c) allows a court to decline supplemental jurisdiction after dismissing every claim over which it had original jurisdiction, this decision is purely discretionary. 28 U.S.C. § 1367(c) ("The district courts *may* decline to exercise supplemental jurisdiction ....") (emphasis added); *Carlsbad Tech., Inc. v. HIF Bio, Inc.,* 556 U.S. 635, 639, 129 S.Ct. 1862, 173 L.Ed.2d 843 (2009). Accordingly, because the plaintiff's state law claims arise from the same incident as the plaintiff's federal law claims and require similar factual analysis, I respectfully recommend the Court exercise supplemental jurisdiction over plaintiff's state law claims of negligent infliction of emotional distress and negligent supervision.

#### b. Negligent Infliction of Emotional Distress

Under New York law, a claim of negligent infliction of emotional distress

requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress. *Romero,* 839 F.Supp.2d at 631. A defendant will be found liable "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 629, 631 (citing *Naughright v. Weiss,* 826 F.Supp.2d 676, 697 (S.D.N.Y.2011)). Additionally, to succeed on a claim based on an injury of purely emotional harm, a plaintiff must premise her cause of action "upon a breach of duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety." *Id.* at 631 (quoting *Simpson v. Uniondale Union Free Sch. Dist.,* 702 F.Supp.2d 122, 135 (E.D.N.Y.2010)).

 Here, neither DOE's nor Matone's conduct was extreme or outrageous. As discussed previously concerning plaintiff's Title IX claim, Matone and New Utrecht officials acted reasonably in disciplining B.P. throughout his tenure at the school and in responding to the incident involving M.H. Following M.H.'s report, defendants took immediate, affirmative steps to protect both M.H. and the school by contacting the police and suspending B.P. for one year. Given this evidence, no reasonable juror could find that defendants' response was "utterly intolerable in a civilized community." *Id.* at 629, 631 (quoting *Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F.Supp.2d 387, 403 (E.D.N.Y.2005)) (finding DOE's conduct was not extreme or outrageous where they took immediate steps to commence investigation into sexual relationship between teacher and student).

Further, neither DOE's nor Matone's conduct endangered M.H.'s physical safety or caused her to fear for her physical safety. The evidence in the record shows that only B.P.'s conduct, and not the DOE's response, endangered M.H.'s physical safety and made her fear for her safety in the future. *See id.* at 631–32 (finding sexual relationship with teacher endangered student's emotional and physical safety, but not DOE, who responded reasonably to illicit relationship); *Doe v. Archbishop Stepinac High Sch.,* 286 A.D.2d 478, 479, 729 N.Y.S.2d 538 (N.Y.App. Div.2d Dep't 2001) (dismissing claim of negligent infliction of emotional distress against school and Archdiocese where fellow student assaulted plaintiff on class trip and there was no evidence that defendants' conduct unreasonably endangered plaintiff's physical safety).

Accordingly, I respectfully recommend the Court grant summary judgment in favor of DOE and Matone on plaintiff's claim of negligent infliction of emotional distress.

### c. *Negligent Supervision*

 Under New York law, "[s]chools are under a duty to adequately supervise the students in their charge and they will be held liable for foreseeable injuries proximately related to the absence of adequate supervision." *Mirand v. City of New York,* 84 N.Y.2d 44, 49, 614 N.Y.S.2d 372, 637 N.E.2d 263 (1994). The imposition of this duty does not make schools insurers of the safety of their students, "for they cannot be reasonably expected to continuously supervise and control all movements and activities of students." *Id.; Smith v. Half Hollow Hills Centr. Sch. Dist.,* 349 F.Supp.2d 521, 524 (E.D.N.Y.2004). To prevail on a claim of negligent supervision, plaintiff must show (1) a breach of this duty, and (2) that such breach was the proximate cause of the injury. *Smith,* 349 F.Supp.2d at 524 (citing *Mi-*

*rand,* 84 N.Y.2d at 49–50, 614 N.Y.S.2d 372, 637 N.E.2d 263).

■ In a case stemming from injuries caused by the acts of fellow students, a "breach of duty is established only by showing that the defendant school had specific, prior knowledge of the danger that caused the injury, 'that is that the third-party acts could reasonably have been anticipated.'" *Id.* (quoting *Mirand,* 84 N.Y.2d at 49, 614 N.Y.S.2d 372, 637 N.E.2d 263). Unlike in a sexual harassment claim under Title IX, in a negligent supervision claim under New York law constructive notice is adequate as long as it is "sufficiently specific knowledge or notice of the dangerous conduct." *Brandy B. v. Eden Cent. Sch. Dist.,* 15 N.Y.3d 297, 302, 907 N.Y.S.2d 735, 934 N.E.2d 304 (2010) (citing *Mirand,* 84 N.Y.2d at 49, 614 N.Y.S.2d 372, 637 N.E.2d 263). Because school officials cannot reasonably be expected to guard against all sudden, spontaneous acts between students, injuries stemming from such impulsive conduct cannot give rise to a finding of breach of the duty to supervise. *Mirand,* 84 N.Y.2d at 49, 614 N.Y.S.2d 372, 637 N.E.2d 263; *Smith,* 349 F.Supp.2d at 524–25.

Courts, therefore, "have not hesitated to grant summary judgment to school districts in cases where the district makes a prima facie showing of a lack of notice and/or proximate cause and plaintiff fails to come forward with evidence to the contrary." *Smith,* 349 F.Supp.2d at 525–26 (collecting cases). Many of these cases involve a prima facie showing of a lack of notice where the prior conduct was unrelated to or of a different nature than the conduct at issue. *See, e.g., Jake F. v. Plainview–Old Bethpage Cent. Sch. Dist.,* 94 A.D.3d 804, 805–06, 944 N.Y.S.2d 152 (N.Y.App. Div.2d Dep't 2012) (holding prior instances of nonviolent, disruptive behavior and single, remote incident of fighting two years earlier insufficient to put school district on notice of serious physical assault against another student); *Brandy B.,* 15 N.Y.3d at 302, 907 N.Y.S.2d 735, 934 N.E.2d 304 (finding history of severe behavioral issues with neither displays of aggression nor sexually aggressive behavior insufficient to establish school district's notice of sexual assault upon female student); *Morman v. Ossining Union Free Sch. Dist.,* 297 A.D.2d 788, 789, 747 N.Y.S.2d 586 (N.Y.App. Div.2d Dep't 2002) (finding that extensive insubordinate, disruptive, non-violent behavior, plus one incident of fighting, insufficiently similar to put school district on notice of physical assault upon another student); *Taylor v. Dunkirk City Sch. Dist.,* 12 A.D.3d 1114, 1114, 785 N.Y.S.2d 623 (N.Y.App. Div. 4th Dep't 2004) (finding school district had no reason to anticipate sudden hallway assault where assailant's prior conduct consisted of disruptive and defiant behavior towards teacher and verbally aggressive behavior towards victim student, but no history of physically aggressive behavior).

■ Similarly, here, defendants have made a prima facie showing that they lacked actual or constructive notice of any prior, specific similar conduct by B.P. As discussed above, B.P. has an extensive disciplinary record; however, the majority of incidents involved insubordinate, aggressive, and threatening behavior towards teachers, not fellow students. The only prior incident in the record that involves physical contact with a female student consists solely of B.P. trying to touch a female student's neck and hair, and, after being separated from the student, blowing kisses at "females." This prior incident, which only came to light in a deposition after M.H.'s abuse, and B.P.'s past problematic conduct are insufficient to place defendant on notice that B.P. would sexually abuse a female student.

Further, defendants did not leave B.P.'s problematic behavior unaddressed: Matone suspended B.P. on three separate occasions in the five months leading up to the incident with M.H. According to the DOE Disciplinary Code, each of these suspensions was an appropriate disciplinary response to B.P.'s conduct. *See* Disciplinary Code at 18–24. Preventing the attack on M.H. would have been possible only if B.P. were permanently removed from New Utrecht or personally escorted by an aide every moment of every school day. *See Smith,* 349 F.Supp.2d at 527 (finding school district, which had previously suspended problematic student for fighting, could have prevented physical assault on student only if district permanently removed student or provided him with constant personal aide). Such a response, however, by defendants would have been unreasonable because defendants had no evidence that B.P. posed such a danger to his fellow students as to require that level of supervision. The lack of a specific threat of sexually abusive behavior defeats any claim that defendants breached a duty to M.H. *See id.* (citing *Taylor,* 12 A.D.3d at 1115, 785 N.Y.S.2d 623).

Here, the record contains no evidence that defendants had actual or constructive notice of B.P.'s danger to female students, nor does it contain evidence that defendants breached a duty to M.H. Plaintiff failed to raise an issue of fact regarding notice or a breach of duty. Accordingly, I respectfully recommend granting defendants' summary judgment motion on plaintiff's state law claim of negligent supervision against DOE and Matone.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Court grant defendants' motion for summary judgment as to all federal and state law claims.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of the date of entry of this Report and Recommendation. Failure to file objections within the specified time waives the right to appeal the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 72.